174 Cal.App.4th 900 (2009)
In re COLE C., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent,
v.
MARK C., Defendant and Appellant.
No. D053845.
Court of Appeals of California, Fourth District, Division One.
June 4, 2009.
*903 Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.
John J. Sansone, County Counsel, John E. Philips, Chief Deputy County Counsel, Paula J. Roach and Michelle Neumann-Ribner, Deputy County Counsel, for Plaintiff and Respondent.
William H. Hook, under appointment by the Court of Appeal, for Minor.

OPINION
HUFFMAN, Acting P. J.
Mark C. is the father of Cole C. and the stepfather of Chloe V. and Ella V., Cole's half siblings.[1] The San Diego County Health and Human Services Agency (Agency) filed petitions on behalf of the three minors following allegations of physical and sexual abuse.
*904 In this appeal, Mark challenges orders declaring Cole a dependent of the juvenile court under Welfare and Institutions Code[2] section 300, subdivision (j) and removing Cole from his custody under section 361, subdivision (c)(1).
Mark asserts (1) the court erred by applying the psychotherapist-patient privilege concerning therapy sessions that Chloe and Ella participated in before the Agency filed petitions on their behalf; (2) the court denied his due process rights when the court made its findings concerning Chloe's and Ella's petitions before he presented all of his evidence regarding Cole's petition; and (3) the court lacked sufficient evidence to support its jurisdictional and dispositional findings. We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND
In April 2008, the Agency investigated allegations claiming Mark physically, emotionally and sexually abused Chloe and Ella, then six and four years old. Based on these allegations, the Agency filed a petition on behalf of seven-month-old Cole under section 300, subdivision (j). The petition alleged Cole's half siblings, Chloe and Ella, had been subjected to physical harm and excessive discipline. Mark used cold showers, icepacks and hosed down the girls as forms of discipline. The petition also alleged Mark stated Cole would receive harsher discipline because he was a boy.
In the Agency's detention report, social worker Robyn Jensen reported her findings following her interview with the minors' former nanny, Angie H. Angie worked with the family for about three and a half months. During that time, she reported Mark used cold showers, icepacks and sprayed the girls with a hose as forms of discipline. Angie also reported concerns that Mark sexually abused the girls. Ella would masturbate "aggressively" during naps and when Angie asked Ella why she touched her private area, Ella responded "Mark touches." Chloe disclosed Mark touched her vaginal area over her clothes. Chloe described to Angie a game Mark played with her and Ella. Mark would have the girls lie in certain positions, including having the girls spread their legs and lie on top of each other. Chloe also disclosed that Mark would lie on top of her when she was in trouble.
Ella told Ms. Jensen that Mark would put an icepack on her stomach and back if she was bad. Mark would also take Ella outside and spray her with cold water. During her investigations, Ms. Jensen learned Chloe suffered from a weak bladder and enuresis. Mark would punish Chloe for wetting her pants by having her wash her own underwear and by threatening to tell her friends at school.
*905 Ms. Jensen interviewed the girls' biological father, Dean V. Dean reported Chloe told him that Mark had touched her vaginal area and that Mark would lock her in the garage and use icepacks for discipline. Dean confronted Heather, the girls' mother, about Chloe's statements. Heather minimized the disclosures made by Chloe and told Dean not to trust Chloe. Ms. Jensen confirmed with the children's maternal grandparents that Dean had called Heather to confront her about Chloe's disclosures.
Ms. Jensen interviewed Mark, and he admitted he used icepacks, cold showers and sprayed the girls with a hose as means of obtaining obedience. He referred to these methods as "cycle interrupt." Mark placed the packs on the girls' chests when they misbehaved, and he admitted spraying the girls with a hose on two occasions. He acknowledged the girls did not like being sprayed. He also admitted he would turn the water on cold for about five seconds when the girls were taking a shower and misbehaving. He stated that Cole would "have a harsher punishment when he is older, due to being a male." Mark explained because the girls felt he favored Cole, he assured them Cole would face harsher punishment because Cole is a boy.
Heather admitted Mark used the icepacks but she did not feel this method was abusive to the girls and indicated the methods would stop if the Agency insisted. She did not see the harm in using these particular methods. Heather denied having any concerns about the girls being sexually abused. Ms. Jensen discussed with Heather Chloe's disclosures to Dean that she had been sexually abused by Mark. Heather dismissed the statements claiming it was Dean's way of attempting to gain custody of the girls.
Ms. Jensen requested that the girls participate in an extended forensic exam (EFE) to address the sexual abuse allegations. Ms. Jensen explained that the EFE was the preferred method of refuting sexual abuse allegations. Heather became defensive and stated she knew her children were not being abused. She eventually agreed to have her daughters submit to the EFE.
In May 2008, social worker Jessica Newmyer spoke with Mark concerning the allegations against him. He explained that he was not behaving in a sexual manner with the girls and that when the girls were on top of him, he was wrestling with them. He denied touching the girls in a sexual manner.
Shortly after Mark's interview with Ms. Newmyer, Ms. Jensen received a report from the girls' school principal indicating Mark came to the school and appeared angry. He told school staff that he was being accused of putting his fingers in Chloe's vagina. Mark then stated, "I can't stay 200 feet from a school; my backyard is too close and its pedophile heaven. Anybody can grab a kid."
*906 Following the investigation, the Agency determined the minors were at risk of harm based on the sexual abuse disclosures and the disciplinary methods used by Mark. The court held a detention hearing and found a prima facie showing had been made. The court detained the girls in out-of-home care. Cole remained in the care of Heather on the condition Mark not live with them and that Heather was not to supervise Mark's visits with the minors.
In a jurisdiction report, the Agency provided additional confirmation and details surrounding the alleged physical harm suffered by the girls. Social worker Lindsey Clark met with the girls and they confirmed, when they misbehaved, Mark sprayed them with a hose, placed icepacks on their backs and stomachs and locked them in the garage. Chloe explained when Mark sprayed her and Ella with a water hose, they were not wearing swimsuits and were naked. Ms. Clark asked the girls about the cold showers. They explained Mark would turn the water to cold in the shower when they were in trouble.
Ella revealed Mark would punish her by putting her outside and locking the door. Ella explained it would be dark outside and that sometimes she was alone and other times Chloe was with her. Both girls stated Mark sometimes locked them in the dark in the garage.

Contested Jurisdiction and Disposition Hearing Concerning Chloe and Ella
The court held a contested jurisdiction and disposition hearing and heard testimony from several witnesses, including Dean and Angie.
Dean testified he lived in Northern California. He separated from Heather more than two years before and claimed he had an amicable relationship with Heather. In June 2007, the girls had a two-week visit with Dean. After a bath one evening, Dean testified he was drying Chloe with a towel and while he was drying her off she told him, "Mark touches me there," in reference to her vaginal area. Ella confirmed Chloe's statement by nodding her head. Dean attempted to clarify if Chloe meant using a towel to dry her off just as he had been doing, but Chloe said Mark had touched her. Dean telephoned Heather to discuss Chloe's statements, and Heather said to him that small children make things up. Heather told Dean not to call social services or the police.
Dean also described seeing the girls masturbate and that the girls continued to act out sexually with more frequency as time went on. Dean claimed the girls did not engage in sexual behaviors before Mark came into their lives.
Concerning the allegations of physical abuse, in October 2007, Dean met the girls at Disneyland. Dean overheard Mark telling the girls to behave *907 because, "otherwise when you get home, something very bad will happen." During the visit, the girls repeatedly asked Dean if they were behaving well. He asked the girls why they repeated themselves; they told him if they misbehaved Mark would lock them in the garage and turn off the lights.
Angie testified that she worked five days a week taking care of the girls and after less than one week on the job, she noticed Mark acting aggressively toward the girls. As Angie brushed Chloe's hair, Mark would push Angie aside, grab Chloe's hair and pull it. Mark would pull Chloe's hair on a daily basis. On another occasion, Angie was bathing the girls and Mark came in the bathroom and grabbed Chloe's hair. He took Chloe outside, naked and dripping wet. Angie saw Mark hose Chloe down with a garden hose. Angie witnessed two more garden hose incidents, and she would hear the girls scream and cry when the water hit them.
On another occasion, Ella had been crying after she woke up from a nap. Mark took an icepack from the freezer, went to Ella's room and Angie heard Ella screaming. The next day Ella told Angie that Mark made her step on the icepack and then he lifted up her shirt and pressed the icepack on her stomach and back.
Angie further testified she would pick up Chloe from school, and Chloe would be very anxious and nervous about going home. She would ask Angie if Mark was going to be at home. Chloe also would wet her pants at school about two times a week. Angie witnessed Mark on three or four occasions directing Chloe to wash the clothes she had soiled in the driveway. Angie testified Chloe's anxiousness decreased when Mark was away from the home for lengthy periods of time. Mark went out of town for about one month and during this time, the girls' behavior improved and they were happier. Chloe had fewer accidents, and she was happy when Angie picked her up from school.
In March 2008, Angie contacted child protective services. Angie had seen Ella masturbate at home, especially during naptime and reading times. Angie asked Ella if someone had touched her vaginal area, and Ella responded Mark rubs her there. Chloe also pointed to her vaginal area and told Angie that Mark had rubbed her there.
During the course of the jurisdiction and disposition hearing, the Agency submitted amended petitions on behalf of Chloe and Ella. The petitions had been amended as part of a settlement reached by Dean and Heather. Dean and Heather submitted to the section 300, subdivision (b) allegations dealing with the physical abuse of the girls. Heather also submitted as to Cole's section 300, subdivision (j) petition. Mark did not submit to the allegations in Cole's *908 petition. The Agency requested dismissal of the section 300, subdivision (d), sexual abuse petitions concerning Chloe and Ella. The court granted the Agency's request.
The court found the amended petitions concerning Chloe and Ella to be true by clear and convincing evidence, declared the girls dependents, removed them from Heather's care and placed them with Dean. The court ordered services for Dean, Heather and the girls. The court scheduled a six-month review hearing and ordered a no-contact order for Mark remain in effect.
The court then proceeded with the trial and addressed the petition filed on behalf of Cole. The court indicated that although the petition concerning Cole was almost identical to the girls' petitions, the issues were different because in Cole's case, the issue was whether the allegations created a risk to Cole.

Contested Jurisdiction and Disposition Hearing Concerning Cole
Ms. Clark testified as an expert on risk assessment. Ms. Clark stated the girls showed her examples of the types of large icepacks Mark put on their bodies. The girls also told Ms. Clark that Mark sprayed them with a garden hose when they were not wearing clothes as a way to discipline them. Ms. Clark met with Mark, and he confirmed he used the packs to pacify the girls when they misbehaved or acted upset. He claimed he sprayed the girls with the hose because they asked to be sprayed as he watered a tree in the front yard. Ms. Clark recommended Cole remain in Heather's care with Mark living out of the home. Ms. Clark expressed concern regarding Mark's comments that Cole would receive harsher discipline than the girls.
Ms. Newmyer also testified as an expert on risk assessment. She indicated the risk factors for Cole included the types of disciplinary methods Mark used on the girls, his report that Cole would receive harsher treatment, that Mark developed his own disciplinary techniques and that these techniques were used on the girls to stop their behaviors quickly. Ms. Newmyer expressed concern that Mark would create or devise his own methods of discipline that could be harmful to Cole. There were also concerns surrounding the sexual abuse allegations that placed Cole at risk.
Ms. Shelly Paule testified in her capacity as the Agency supervisor of Cole's case. Ms. Paule noted Mark had not been cooperative throughout the case. He had not accepted voluntary service referrals or participated in visits with Cole that took place in a structured setting. Mark denied any wrongdoing in the case. Ms. Paule testified Mark came to her stating he had some *909 concerns dealing with Ms. Clark's discussion of him in the Agency's reports. Ms. Paule offered to discuss Mark's concerns with him but he declined.
Ruth Supranovich testified that she managed Cole's case in April 2008 in her capacity as the assistant deputy director of the Agency's north region. She believed Cole was at risk of suffering harm in the future. She identified two areas of risk. There was the risk of possible sexual abuse and the risk of possible physical harm based on the unusual parenting techniques implemented by Mark. The girls showed signs of anxiety and fear of Mark. Mark and Heather appeared to have a poor understanding of how to intervene with certain behaviors exhibited by the children. Ms. Supranovich also believed there was risk to Cole because she was unaware if Mark had left the family home.
After considering the evidence, including testimony from the witnesses and the Agency's reports, the court found by clear and convincing evidence that the allegations of Cole's petition were true. The court found Dean and Angie to be credible witnesses and it also found several witnesses for Mark to be credible. The court revisited the issue of the Agency social workers' propriety and did not find any of the social workers' conduct to be biased or unprofessional.
The court found it had jurisdiction and declared Cole a dependent, removed him from Mark's care and placed Cole with Heather. The court also found that the Agency made reasonable efforts to prevent or eliminate the need for removal, and it ordered Mark to comply with a reunification plan.

DISCUSSION

I

PSYCHOTHERAPIST-PATIENT PRIVILEGE
Mark argues the juvenile court erred by preventing Dr. Kimberly Corbett, Heather and the girls' therapist, from testifying at trial and making statements in Agency reports based on the psychotherapist-patient privilege. Mark asserts (1) William Giddens, the girls' attorney, could not raise the privilege on behalf of the girls because the counseling they received from Dr. Corbett had been obtained before Mr. Giddens was appointed as their attorney; (2) Heather held the privilege and because she waived the privilege, he is entitled to the information; and (3) the court should have allowed Dr. Corbett's statements in evidence because the evidence was exculpatory.

*910 A. Background

On May 21, 2008, Heather filed a motion requesting that the juvenile court return the girls to her care and custody. The court held a special hearing to address Heather's request. In support of her request, Heather submitted a letter from Dr. Corbett. Dr. Corbett indicated she started meeting Heather and the girls for therapy sessions before the start of the dependency proceedings. She met with Heather on an individual level to address Heather's divorce from Dean and to assist with integrating Mark into the girls' lives. Dr. Corbett also met with Heather and the girls in a group setting, and sometimes with Chloe on an individual level. Dr. Corbett's letter submitted by Heather provided details surrounding her therapy sessions with Heather and the girls.
Mark argues that after the initial submission of Dr. Corbett's letter, Mr. Giddens did not raise any objections. Mark notes that on May 21, 2008, the Agency filed a report containing statements made by Dr. Corbett. No party asserted the psychotherapist-patient privilege. On July 15, 2008, Mark filed a motion to dismiss the case and submitted the same letter written by Dr. Corbett. On July 28, 2008, Mark and Heather submitted their witness lists for trial, and Dr. Corbett was listed as a witness. On July 31, 2008, Mr. Giddens asserted the psychotherapist-patient privilege on behalf of the girls. The court found the privilege applied and struck Dr. Corbett's letter from Heather's May 21, 2008 motion. The court permitted Mark to call Dr. Corbett as a witness regarding any therapy provided to Heather but denied any testimony as to Chloe and Ella.

B. Relevant Law

(1) It is established that the psychotherapist-patient privilege applies to the relationship between a dependent minor and his or her therapist. (In re Daniel C.H. (1990) 220 Cal.App.3d 814 [269 Cal.Rptr. 624]; In re Eduardo A. (1989) 209 Cal.App.3d 1038, 1041-1043 [261 Cal.Rptr. 68].) "[T]he purpose of the privilege is to protect the privacy of a patient's confidential communications to his [or her] psychotherapist. [Citations.]" (In re Daniel C.H., supra, at p. 826.) In this relationship between a patient and a therapist, the patient generally is the holder of the privilege unless the patient has a guardian or conservator. (In re Kristine W. (2001) 94 Cal.App.4th 521, 525-526 [114 Cal.Rptr.2d 369].)
(2) For dependency proceedings, counsel that is appointed for a minor serves as the child's guardian ad litem. (See § 326.5; In re Josiah Z. (2005) 36 Cal.4th 664, 679 [31 Cal.Rptr.3d 472, 115 P.3d 1133].) A guardian ad litem is responsible for both evaluating "the situation and needs of the child" and "mak[ing] recommendations to the court concerning the best interests of the *911 child." (42 U.S.C. § 5106a(b)(2)(A)(xiii)(I), (II).) The guardian ad litem is required to "`represent and protect the rights and best interests of the child.'" (In re Josiah Z., supra, at p. 679, citing 45 C.F.R. § 1340.14(g) (2004), 55 Fed.Reg. 27639 (July 5, 1990).) The guardian, therefore, becomes a "fiduciary whose role is to investigate the child's circumstances and advocate for [the child's] best interests." (In re Josiah Z., supra, at p. 679.)
Section 317, subdivision (f) provides that in dependency proceedings: "Either the child or the counsel for the child, with the informed consent of the child if the child is found by the court to be of sufficient age and maturity to so consent . . . may invoke the psychotherapist-client privilege. . . . Counsel shall be holder of th[is] privilege[] if the child is found by the court not to be of sufficient age and maturity to so consent. . . ." Thus, once an attorney has been appointed for a minor in a juvenile dependency matter, the attorney holds the privilege to therapeutic communications sought to be introduced in evidence. (See § 317, subd. (f).)
In ruling on the admissibility of evidence, the trial court is vested with broad discretion. "`[T]he court's ruling will be upset only if there is a clear showing of an abuse of discretion.' [Citation.] `"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. . . ."'" (Tudor Ranches, Inc. v. State Comp. Ins. Fund (1998) 65 Cal.App.4th 1422, 1431 [77 Cal.Rptr.2d 574].)

C. Counsel for Chloe and Ella Held the Psychotherapist-patient Privilege

(3) Mark and the Agency argue that the consideration before this court is who holds the privilege when the privileged communication arose before the onset of dependency proceedings and before the court appointed counsel for the minors. We conclude that the holder of the privilege is determined at the time the disclosure of the confidential communications is sought to be introduced in evidence.
(4) Mark sought to introduce in evidence statements made by Dr. Corbett after Mr. Giddens had been appointed counsel for Chloe and Ella. Accordingly, Mr. Giddens had authority under sections 317 and 326.5 to assert the privilege on behalf of the girls during the course of the proceedings.[3] Regardless of whether the conversations between Dr. Corbett and the girls *912 took place before the start of the proceedings, Mr. Giddens still had the authority to assert the privilege on the girls' behalf. As discussed, a child's guardian ad litem is charged with the most important responsibilityto assess the needs of a child and make recommendations to the court concerning the child's best interests. (See In re Josiah Z., supra, 36 Cal.4th at p. 679.) To deny the child's guardian ad litem the ability to assert the privilege at the time the disclosures are sought would leave all discussions that took place in advance of the dependency proceedings without protection. Therefore, the proper time for the guardian to invoke the privilege is at the time the disclosure of confidential discussions is attempted. The court did not err by allowing Mr. Giddens to assert the privilege on behalf of the girls.[4]

D. The Court Did Not Abuse Its Discretion When It Disallowed Dr. Corbett's Statements and Testimony

Mark asserts the court abused its discretion and violated his due process rights by disallowing Dr. Corbett's statements in evidence because the statements were exculpatory and would have allowed him to refute the allegations against him. Specifically, he asserts the girls did not disclose abuse to Dr. Corbett and the information was favorable to him due to its exculpatory nature.
(5) The psychotherapist-patient privilege is not absolute and communications may be disclosed to "those to whom disclosure is reasonably necessary for . . . the accomplishment of the purpose for which the psychotherapist is consulted . . . ." (Evid. Code, § 1012.) "In the juvenile dependency context. . . therapy has a dual purposetreatment of the child to ameliorate the effects of abuse or neglect and the disclosure of information from which reasoned recommendations and decisions regarding the child's welfare can be made." (In re Mark L. (2001) 94 Cal.App.4th 573, 584 [114 Cal.Rptr.2d 499].)
The conversations the girls had with Dr. Corbett in this case took place before the dependency proceedings began. The focus of those sessions was *913 not for the girls to address their reactions to Mark's parenting techniques or alleged sexual abuse. Therefore, the purpose of therapy with Dr. Corbett was not to assist the dependency court in making its findings at the jurisdiction and disposition hearing, and the court did not err by preserving the privilege and disallowing Dr. Corbett's statements. In any event, Mark still had the option of presenting exculpatory evidence. He was allowed the opportunity to present Dr. Corbett as a witness to testify concerning therapy provided to Heather. Mark also had the opportunity to call numerous other witnesses on his behalf, which he did.[5] Even had Dr. Corbett testified that the girls never disclosed abuse to her during therapy, the girls consistently disclosed the abuse to others, including social workers, Dean and their nanny. The court did not abuse its discretion or violate Mark's due process rights by disallowing Dr. Corbett's statements and testimony in evidence.

II

DUE PROCESS CLAIMS
Mark contends he was denied his due process rights and a right to a fair hearing. Specifically, he asserts the court erred when it found true Chloe's and Ella's petitions for physical abuse before it heard evidence concerning Cole's petition. Mark also asserts the court should have declared a mistrial or dismissed the minors' petitions because of bias on the part of social workers, discovery abuses and failure of the Agency to follow protocols.[6]

A. Legal Principles

(6) Due process in the context of dependency law tends to focus on the right to a hearing, the right to notice and an opportunity to present objections. (In re Crystal J. (1993) 12 Cal.App.4th 407, 412-413 [15 Cal.Rptr.2d 613]; In re Melinda J. (1991) 234 Cal.App.3d 1413, 1418 [286 Cal.Rptr. 239].) The parent in a dependency proceeding has a due process right to confront and cross-examine witnesses. (In re Mary S. (1986) 186 Cal.App.3d 414, 419-420 [230 Cal.Rptr. 726].) "The essence of due process is fairness in the procedure employed ...." (Ingrid E. v. Superior Court (1999) 75 Cal.App.4th 751, 757 [89 Cal.Rptr.2d 407].)

*914 B. Background

Before the start of the contested jurisdiction and disposition hearing, Mark filed numerous motions for the court's consideration. The motions included (1) a request that the court find social worker Ms. Clark biased and strike her reports; and (2) a request that the court issue an order disallowing any testimony at trial relating to voice mail messages previously erased by the Agency. The court denied Mark's motion concerning Ms. Clark after finding that her conduct was not biased or unprofessional. Concerning Mark's second motion, Mark argued the Agency destroyed evidence in the form of voice mail messages. Mark argued he had requested copies of various voice mail messages, but the Agency claimed they had been inadvertently erased. After hearing the motion, the court ordered that any information surrounding the erased messages would not be allowed in evidence. At the conclusion of the hearing relating to Cole's petition, Mark renewed his motion claiming Ms. Clark was biased against him. The court, after hearing additional argument on the issue, denied the motion.
On September 5, 2008, after hearing evidence relating to the petitions filed on behalf of the girls, the court accepted a partial settlement of the case. The terms of the settlement provided that Heather and Dean submit on the reports and agree to the amended language of the petitions. Heather and Dean submitted to the section 300, subdivision (b) allegations as to both girls. Heather also submitted to Cole's section 300, subdivision (j) petition. The Agency requested a dismissal of the section 300, subdivision (d) claims of sexual abuse, which the court granted. The court declared the girls dependents, removed them from Heather's care and placed them with Dean. The court then proceeded with the trial and heard evidence presented in relation to the section 300, subdivision (j) petition concerning Cole.

C. Analysis

Mark asserts the court, in making its findings on the girls' petitions before he completed the presentation of his case concerning Cole's petition, deprived him of a fair hearing and violated his due process rights. We disagree. After Heather submitted to the allegations in the amended petition, the court stated Mark continued to have an opportunity to disprove that Cole was at risk of suffering the same type of harm. Mark presented extensive evidence as to Cole's petition following the conclusion of the trial concerning Chloe's and Ella's petitions. The trial for Cole's petition lasted 14 days. Mark presented an additional 16 witnesses and cross-examined seven Agency witnesses. The court also received in evidence numerous documents presented by Mark. At the conclusion of the hearing, the court could have dismissed Cole's petition if it did not believe Cole was at risk of harm. The *915 trial court was under no legal obligation to automatically find Cole was at risk of harm because his half siblings were found to be at risk of physical harm. The court instead properly heard evidence and considered the circumstances surrounding Cole and whether he would be at risk of suffering harm based on his half siblings' abuse. (§ 300, subd. (j).)
Concerning the issues raised in Mark's motions claiming bias and destruction of the voice mail messages, Mark has addressed these issues in motions filed before the trial court. The record shows the court heard testimony and reviewed these issues at trial. Mark had the opportunity to examine the Agency's witnesses. Mark also presented extensive arguments dealing with his claims. In one instance, Mark renewed his motion arguing Ms. Clark's bias and the court again heard extensive arguments on the issue. A review of the record also shows Mark had the opportunity to cross-examine all the social workers who had a role in his case, including Ms. Clark, at trial. Further, Mark had the opportunity to challenge all of the reports generated by the Agency in this case.[7] To ensure this opportunity, the court disallowed the Agency from discussing or using as evidence the voice mail messages that had been inadvertently erased and the few social worker's notes that had been shredded. No due process violations occurred.

III

MARK CHALLENGES THE COURT'S JURISDICTIONAL FINDINGS
Mark challenges the sufficiency of the evidence to support the court's jurisdictional findings under section 300, subdivision (j). He asserts the evidence of Chloe's and Ella's physical abuse was insufficient to support a finding Cole was at substantial risk of harm under section 300, subdivision (j) because any risk to Cole was based on speculation.

A. Standard of Review

In reviewing the sufficiency of the evidence on appeal, we look to the entire record to determine whether there is substantial evidence to support the *916 findings of the juvenile court. We do not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order, and affirm the order even if there is other evidence that would support a contrary finding. (In re Casey D. (1999) 70 Cal.App.4th 38, 52-53 [82 Cal.Rptr.2d 426].) When the trial court makes findings by the elevated standard of clear and convincing evidence, the substantial evidence test remains the standard of review on appeal. (In re Mark L., supra, 94 Cal.App.4th at pp. 580-581.) The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order. (In re L. Y. L. (2002) 101 Cal.App.4th 942, 947 [124 Cal.Rptr.2d 688]; In re Geoffrey G. (1979) 98 Cal.App.3d 412, 420 [159 Cal.Rptr. 460].)

B. Substantial Evidence Supports the Court's Section 300, Subdivision (j) Jurisdictional Finding

Mark argues there was insufficient evidence to support the court's jurisdictional finding for Cole under section 300, subdivision (j). Section 300, subdivision (j) provides that a child is within the juvenile court's jurisdiction if "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling . . . and any other factors the court considers probative in determining whether there is a substantial risk to the child."
(7) Cole remains at risk of suffering serious harm because Mark implemented excessive disciplinary methods on Chloe and Ella. Ms. Supranovich testified that Cole was at risk of sexual abuse and physical abuse based on the disclosures made by the girls to various social workers, Dean and Angie. The girls showed signs of strong anxiety and emotional reactions to the use of Mark's parenting and disciplinary techniques. Mark would use icepacks, cold showers and spray the girls with a hose to control their behavior. Angie witnessed Mark spraying Chloe with a hose, without her clothes on, after Mark pulled Chloe out of the shower. Angie also saw Mark pulling Chloe's hair on a regular basis. Both girls told social workers that Mark locked them in the garage or outside in the dark. Finally, Mark stated he would implement harsher disciplinary techniques on Cole because he was a boy. The Agency reported that Mark and Heather did not appear concerned or question the appropriateness of these parenting techniques. Mark's actions toward the girls and his inability to acknowledge the excessive nature of his disciplinary techniques placed Cole at risk of abuse. Cole is a young child *917 who would not be able to defend himself from such methods of discipline. Substantial evidence supports the jurisdictional findings under section 300, subdivision (j).

IV

MARK'S CHALLENGE TO THE COURT'S DISPOSITIONAL FINDINGS
Mark contends the evidence was insufficient to justify removing Cole from his custody. He argues the facts do not warrant removing Cole from his custody because the court's findings were based on the speculation that he would physically abuse Cole in the future.

A. Standard of Review

(8) Before the court may order a child physically removed from his or her parent, it must find, by clear and convincing evidence, that the child would be at substantial risk of harm if returned home and that there are no reasonable means by which the child can be protected without removal. (§ 361, subd. (c)(1); In re Kristin H. (1996) 46 Cal.App.4th 1635, 1654 [54 Cal.Rptr.2d 722].) The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home. (§ 361, subd. (c)(1).) The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child. (In re Diamond H. (2000) 82 Cal.App.4th 1127, 1136 [98 Cal.Rptr.2d 715], disapproved on another ground in Renee J. v. Superior Court (2001) 26 Cal.4th 735, 748, fn. 6 [110 Cal.Rptr.2d 828, 28 P.3d 876]; In re Jamie M. (1982) 134 Cal.App.3d 530, 536 [184 Cal.Rptr. 778], citing In re B. G. (1974) 11 Cal.3d 679, 699 [114 Cal.Rptr. 444, 523 P.2d 244].) In this regard, the court may consider the parent's past conduct as well as present circumstances. (In re S. O. (2002) 103 Cal.App.4th 453, 461 [126 Cal.Rptr.2d 554].)

B. Cole Remained at Risk in Mark's Care

As discussed previously with respect to the court's jurisdictional findings, substantial evidence supports the court's findings that the physical abuse endured by the girls placed Cole at substantial risk of harm. Mark used excessive disciplinary methods that were not age appropriate against the girls. Chloe and Ella described the use of cold showers, icepacks and being sprayed by a garden hose. In addition to the allegations of physical abuse, Cole was at risk based on possible sexual abuse that took place against the girls. The girls told at least two social workers, Dean and Angie that Mark had touched them. *918 Dean observed the girls exhibiting sexual behaviors that he had not seen in them before Mark entered into their lives.
(9) Based on these facts, the social workers believed Cole was not safe and remained at risk. Ms. Newmyer based her risk assessment on the disciplinary methods Mark used on the girls and Mark's statement that Cole would experience harsher disciplinary methods than the girls. The court was entitled to find the social worker's opinion credible and give great weight to her assessment. We cannot reweigh the evidence or substitute our judgment for that of the trial court. (In re Casey D., supra, 70 Cal.App.4th at pp. 52-53.) Further, Mark had not committed himself to participating in services. He had not accepted any voluntary service referrals, he did not participate in visits with Cole in a structured setting and he went several weeks without seeing Cole. Although Cole had not been harmed, a child does not need to be harmed before being removed from his parents' custody. One of the goals of dependency is to protect a child before the harm takes place. It was reasonable for the court to infer based on these circumstances that Cole would be at risk of harm if returned to Mark's care. The court's decision to remove Cole is consistent with the purpose of section 361, subdivision (c), which is to prevent harm to children.

C. Less Restrictive Alternatives

Mark argues the court erred by not considering disposition alternatives less drastic than removal. He asserts he was never offered any referrals relating to the physical abuse allegations.
(10) Before the court removes a child from parental custody, it must find there are no reasonable means by which the child's physical health can be protected without removal. (§ 361, subd. (c)(1).) Although the court must consider alternatives to removal, it has broad discretion in making a dispositional order. (Ibid.)
Mark's argument fails because substantial evidence shows that the Agency made reasonable efforts to prevent the need for Cole's removal, but that such measures were not sufficient in the end to protect Cole. Mark had not accepted any voluntary service referrals, and he did not participate in visits with Cole in a structured setting. Cole would not be safe in Mark's care until Mark acknowledged the inappropriate nature of his parenting techniques and disciplinary methods. Under these circumstances, the evidence supports the court's finding that no reasonable means to protect Cole were available without removing Cole from Mark's custody.

*919 DISPOSITION
The orders are affirmed.
Haller, J., and Irion, J., concurred.
NOTES
[1] Chloe and Ella are not subjects in this appeal.
[2] Statutory references are to the Welfare and Institutions Code.
[3] We recognize that in certain circumstances, parents may assert the privilege on behalf of their children. However, in dependency proceedings, counsel for the child should hold the privilege because parental conflicts of interest may disqualify parents from asserting or waiving privileges. (See In re Daniel C.H., supra, 220 Cal.App.3d at p. 828.) At the time the trial court considered whether to admit the communications, Heather had yet to submit on the allegations of the petitions. Further, the record shows she had not acknowledged the impropriety of Mark's parenting techniques nor did she believe the sexual abuse allegations made by the girls to be true. Her position in the case was in direct conflict with the girls' best interests. Under these circumstances, Heather did not hold the privilege.
[4] Mark asserts Mr. Giddens waived the right to assert the privilege because he did not raise the privilege in a timely manner. Mr. Giddens had notice that Mark wanted to include Dr. Corbett's statements in evidence about two months before Mr. Giddens asserted the privilege. However, Mr. Giddens's assertion was not untimely. At the start of the contested jurisdiction and disposition hearing and about three days after Mark submitted his witness list, Mr. Giddens asserted the privilege. This was well in advance of Dr. Corbett being called to testify at trial. The assertion of the privilege was not untimely.
[5] Mark presented 21 witnesses, cross-examined several Agency witnesses and submitted in excess of 75 exhibits to the court.
[6] Mark also argues the court precluded him from presenting exculpatory evidence set forth in Dr. Corbett's testimony. See part I.D., ante.
[7] In his brief and at oral argument, Mark contends the Agency shredded 47 pages of material implying that such material was lost to the litigants. We determined at oral argument that the social worker's copy was shredded, but that the litigants, including Mark, had a clear copy of the material, and therefore lost nothing by the shredding.