Filed 7/8/15  In re L.G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re L.G., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D067198 |
| Plaintiff and Respondent, | (Super. Ct. No. SJ13060) |
| v. | |
| K.M., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Daniel

Lamborn, Judge.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant

and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County

Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Dependency Legal Group of San Diego, Tilisha Martin, Carolyn Levenberg and

Susan Lake for Minor.

K.M. (the mother) challenges the sufficiency of the evidence to support the juvenile court's disposition order removing her minor daughter, L.G., from parental custody under Welfare and Institutions Code section 361, subdivision (c)(1).[1] She also challenges the sufficiency of the evidence supporting the court's finding that no reasonable alternatives to removal existed. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On August 12, 2014, the police executed a search warrant on the two-bedroom apartment where the mother, father, and four-year-old L.G. lived. Police found plastic baggies containing approximately 340 doses of methamphetamine in the upstairs bedroom and bathroom. Police also found a pill bottle labeled "Diazepam," numerous empty baggies, a digital scale, various stashes of cash, a Taser, and camouflage body armor. A cell phone on the living room coffee table had a text message referring to a narcotics transaction. Police reported all these items were within L.G.'s reach.

The father told police he had such a large quantity of methamphetamine because he smokes it daily and finds it more convenient to buy it all at once. He said the scale was for weighing marijuana he purchases at a dispensary.

The police contacted the San Diego County Health and Human Services Agency (Agency), which sent a social worker to the scene to interview L.G. and her parents. L.G. told the social worker she did not know the word "drugs," but described a white powder she had seen in her house. L.G. said her mother and father put the white powder in small

---

1       All further statutory references are to the Welfare and Institutions Code.

2

clear bags in the kitchen. L.G. is allowed to watch this process, but is not allowed to touch the white powder. L.G. knows where her parents keep the white powder and said she could touch it if she wanted to. She stated her father's " 'friends' " come to the home and give him money in exchange for the white powder, but she does not know them because they are always different people.

The parents were "minimally" cooperative with the social worker. The father acknowledged an extensive criminal history but declined to discuss it with the social worker. He said he takes care of L.G. whenever he can. He admitted to using marijuana for cataracts and back pain, but claimed to never smoke inside the home. When asked if he is ever under the influence while he is caring for L.G., the father changed his story and said he only uses marijuana when the mother is home to take care of L.G. The father denied any substance abuse and denied knowledge of the drugs found in the home.

The mother denied any substance abuse or alcohol use, and denied the father used drugs. She also denied there were any drugs in her home, but added that if there were any, they were not hers. She did not know how the police found drugs in her home and denied being involved in anything illegal. The mother claimed no friends or strangers ever visit their home, only family. She initially stated the father cares for L.G. while the mother works, but when the social worker asked about the father's drug use and criminal history, the mother claimed she was the only one who cared for L.G.

Police arrested both parents for possession of a controlled substance, possession of a controlled substance for sale, and child endangerment.[2] L.G. was taken into protective custody.

The Agency filed a petition under section 300, subdivisions (b) and (g), arising from the accessibility of the contraband to L.G., the father's caring for L.G. while he was under the influence of marijuana, and the parents' resulting incarceration. At the detention hearing, the juvenile court found a prima facie showing had been made on the petition and set a jurisdiction hearing.

In its jurisdiction and disposition report, the Agency reported L.G. had been placed in a confidential foster home, the mother was temporarily living with a relative, and the father was still incarcerated. The mother admitted in an interview that she had " 'made mistakes,' " stating she began using methamphetamine on a daily basis two months earlier. The parents used it together while L.G. was upstairs on the computer in her room. The mother denied the parents sold drugs. She explained the scale police found was used for weighing marijuana, for which she claimed the parents both had medical marijuana cards.[3] The mother stated L.G. was always upstairs when marijuana was smoked, but admitted she sometimes cared for L.G. when she was under the influence of drugs. The mother claimed she kept drugs on a high shelf in the master

---

[2]    The father, who is not a party to this appeal, was also arrested on an outstanding warrant and for being a felon in possession of a stun gun and body armor.

[3]    When asked what medical condition she had that warranted the medical marijuana card, the mother responded, " 'To relax, to smoke.' " She was unable to produce the card when asked to do so by the social worker.

4

bedroom closet. She believed she would benefit from substance abuse treatment, parenting and child development education, and individual therapy for her and L.G. The Agency referred the mother to a substance abuse specialist.

At the jurisdiction hearing, the court made true findings on the section 300, subdivision (b) allegations, dismissed the subdivision (g) allegation, and set the matter for a contested disposition hearing.

In an addendum report, the Agency documented another interview with the mother. The Agency had referred her to one drug treatment program, but she chose another instead. Despite enrolling in drug treatment, the mother denied ever being a drug addict or user. She said she lied earlier about her drug use because she was scared that not doing so might negatively impact her criminal case. In any event, the mother stated she was willing to continue in drug treatment.

An Agency social worker interviewed the mother's drug treatment counselor. The counselor reported that the mother was doing " 'exceptionally well' " in the program. She attended regularly and all of her drug test results were negative. The counselor stated she believed the mother's claim that she was not a drug addict because the mother did not display behavioral characteristics associated with addicts. The mother had developed a recovery plan and completed approximately 75 percent of it.

The mother's visits with L.G. went well. The mother was appropriate and seemed comfortable in her parental role. L.G. seemed very responsive and well-bonded. The visits began as supervised, but progressed to structured unsupervised visits at an Agency facility. The Agency stated it intended to exercise its discretion to allow unsupervised

5

visits in a public location. The Agency was "encouraged by the mother's progress and motivation to be reunited with her daughter."

In a subsequent addendum report, the Agency reported that L.G.'s foster mother had given notice of her intention to end L.G.'s foster placement due to friction between the mother and the foster mother. The Agency placed L.G. with a paternal aunt, where L.G. seemed happy.[4] The mother had supervised visits in the aunt's home and unsupervised visits in public.

The addendum report recommended that L.G. not be placed back with the mother yet. The mother was still attempting to obtain a suitable residence and the Agency was concerned about the mother's truthfulness regarding drug use and sales. The Agency opined that if the mother could not be honest about her involvement with drugs, she could not be trusted to ameliorate the risk it posed to L.G. because "[o]ne cannot work toward solving a problem if one denies the existence of the problem." However, because the mother was sincere in her desire to reunite with L.G., had been compliant with the Agency and service providers, and was diligent about visitation, the Agency recommended that the court continue the "normal progression" of advancing from supervised visits, to structured or limited unsupervised visits, to unsupervised day visits, to overnight visits, to a 60-day trial visit.

---

[4] The Agency had been evaluating the maternal grandmother and a maternal cousin for potential placement. However, both lived in Los Angeles County, and the Agency encountered delay due to the maternal grandmother's "prior history," which involved substance abuse.

6

The court held the contested disposition hearing on October 31, 2014. The court received in evidence the Agency's reports and addenda, a letter from the mother's drug treatment counselor verifying the mother's enrollment and participation in treatment and therapy, and a personal reference from one of the mother's friends. Based on these papers and the argument of counsel—including the request by L.G.'s counsel that the court follow the Agency's recommendation—the juvenile court removed L.G. from parental custody, ordered her placed with a relative, and allowed for supervised visits, with the Agency having discretion to expand them to overnight visits and, with the concurrence of L.G.'s counsel, a 60-day trial visit.

The juvenile court based its ruling on a credibility determination, stating:

> I give full credit to the comments [the mother's counsel] made about the tremendous progress that [the mother] has made in really a short amount of time, her commitment to services, to visitations. The court credits that fully. [¶] The court is very concerned about what happened during the day of the arrest. I know [the father] took full responsibility for what went on. [¶] . . . [¶] What [L.G.] described is very convincing to this court about your conduct there. Your statements early on that you contradicted later on, *the court is convinced beyond clear and convincing evidence that you were involved in this*, that by no reasonable person could it be seen – the stun gun, body armor, methamphetamine, the Diazepam being in the house, and what [L.G.] describes is these strange people coming to the house. *And the court is convinced that you were involved in this.* [¶] And so in spite of all your good work the court is going to need some time, and I'm going to leave discretions with the Agency for progress to be made in this area." (Italics added.)

Even after the court announced its ruling, the mother denied her involvement with drugs, blurting out, "I'm just saying like I'm a good mother, and I try, and I never was involved in none of that."

7

DISCUSSION

The mother contends the evidence was insufficient to support the dispositional order removing L.G. from custody or to show no reasonable alternatives to removal existed.

To remove L.G. from parental custody, the Agency was required to prove by clear and convincing evidence that "[t]here is or would be a substantial danger to [her] physical health, safety, protection, or physical or emotional well-being [if she] were returned home" and that removal was the only reasonable means of protecting her physical health. (§ 361, subd. (c)(1).) Thus, "[a] removal order is proper if it is based on proof of: (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.) The court may consider a parent's past conduct as well as present circumstances to gauge whether the parent has progressed sufficiently to eliminate any risk. (*In re A.S.* (2011) 202 Cal.App.4th 237, 247.) On appeal, the mother bears the burden of showing there is no substantial evidence justifying removal. (*In re Diamond H*. (2000) 82 Cal.App.4th 1127, 1135.)

Substantial evidence supports the court's order removing L.G. from parental custody. The Agency's detention report and the police report describe a scene of substantial danger to L.G.—she knew where drugs were located in her home, could touch them "if she wanted to," witnessed *both parents* package them for sale, and watched her

8

father sell them to " 'friends.' "  Both reports also referenced the inherent dangers of drug use and sales, the risks of which are "commonly imposed upon children under the care of the abuser and trafficker."

The mother's failure to protect L.G. from—or even acknowledge the existence of—this substantially dangerous environment further supports the removal order.  The mother's statements regarding her involvement with drugs were contradicted by her own statements and by L.G.'s.  We do not second-guess the juvenile court's credibility determination.  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 ["assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court."].)

Substantial evidence also supports the court's finding that no reasonable alternatives to removal existed.  First, the mother's counsel acknowledged at the disposition hearing that the mother's "housing has not been completely secured yet." Counsel's statements that the mother planned on securing housing a week after the hearing (which the Agency would then have to verify and approve) and that the mother could temporarily stay with L.G. in her relative placement in the interim (assuming the paternal aunt would allow it) are merely argument from counsel and are not evidence.  (*In re Zeth S.* (2003) 31 Cal.4th 396, 414 ["It is axiomatic that the unsworn statements of counsel are not evidence."].)  Second, even if the mother offered evidence of a viable living arrangement, she has not offered a viable explanation of why it would be safe to place L.G. with her in light of the mother's continuing refusal to acknowledge her role in the circumstances that led to the dependency in the first place.  (See, e.g., *In re Cole C.*

9

(2009) 174 Cal.App.4th 900, 918 ["Cole would not be safe in Mark's care until Mark acknowledged the inappropriate nature of his parenting techniques and disciplinary methods."].)

## DISPOSITION

The judgment is affirmed.


                                                            HALLER, Acting P. J.

WE CONCUR:


McDONALD, J.


IRION, J.