Filed 5/7/26  In re M.P. CA1/4
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re M.P. et al., Persons Coming Under the Juvenile Court Law. | |
| L.C., <br><br> Defendant and Appellant, <br> v. <br> SOLANO COUNTY HEALTH AND HUMAN SERVICES DEPARTMENT, <br><br> Plaintiff and Respondent. | A175076 <br><br> (Solano County Super. Ct. Nos. JD25-00056, J43474-001) |

L.C. (mother) appeals an order issued following a combined jurisdiction and disposition hearing on a Welfare and Institutions Code[1] section 300 petition regarding her now twelve-year-old son, M.P., and her now three-year-old daughter, P.P.  Mother does not challenge the court's jurisdictional findings but argues that the court erred in removing the children from her care.  We find no error and affirm the order.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

# BACKGROUND

On July 30, 2025, the department received a referral regarding concerns for excessive physical discipline of M.P. as well as emotional abuse relating to domestic violence in the home. Specifically, it was reported that father had choked M.P. and attempted to harm mother when she intervened, and that P.P. was present during the incident. Interviews with mother and M.P. the following day confirmed the report.

On August 7, the department filed a petition under section 300, subdivision (b)(1). As to mother, the petition alleged that she and father had a significant history of engaging in domestic violence in the minors' presence and, based in part on the events of July 30, that she is unable to protect M.P. from father's excessive discipline. With respect to father, the petition alleges that his "engagement in domestic disputes and inability to control his anger in the presence of the minor[s] places the minors at significant risk of physical harm, abuse and/or neglect."

Before the detention hearing, the social worker reported that in an interview on July 31, mother said that she and father have been in a relationship since 2013. Mother indicated that she called the police on July 30 due to safety concerns. The report states: "When law enforcement arrived, the mother denied a restraining order and reported she is 'not ready' to take that step." Mother told the social worker that she "would like father to take anger management classes" and that she "would work with the property manager to have her locks changed, as she did not want the father back in the home." Mother and the social

worker completed a safety plan that indicated she would contact law enforcement if father returned to the home and she would contact her support people if she felt unsafe due to father attempting to come to the home.

The social worker reported further that mother and father had a prior dependency case from 2016 in which the court sustained allegations that mother and father were unable to protect M.P. as a result of domestic violence in their relationship. At that time, M.P. was removed from father's care but continued in mother's care with family maintenance services. Jurisdiction was terminated with the parents having joint legal custody and mother having sole physical custody. The report also lists an additional child welfare referral in 2023 for emotional and physical abuse of M.P. that was determined to be inconclusive after investigation.

The social worker also interviewed other family members who confirmed the parents' lengthy history of domestic violence. Mother's aunt reported that mother and father have had ongoing domestic violence throughout their relationship, with both parents being the aggressors. Another maternal aunt indicated that she was aware of the domestic violence history of the parents and reported concern that mother feels father is the only person she can depend on for support and does not believe her children can be removed from her for father's actions. Mother's in-home support staff worker was also interviewed and indicated

3

that mother and father have frequent arguments and have been together for a long time.[2]

At a meeting on August 4, the social worker reiterated her safety concerns and mother acknowledged that she had changed the locks to her home before but thereafter gave the father "a key, as the father is able to speak to her in a way that makes her continue to have a relationship with him." The social worker reported that mother was "unreceptive" to her safety suggestions, which included a restraining order, supervised visits, and changing current custody and visitation orders.

Finally, the social worker reported that during a follow-up conversation with mother on August 6, mother reported that, at her request, father came to the home on Sunday, August 3 to help with diapers and milk.

At the detention hearing on August 8, mother objected to detention of the minors and asserted that she would not permit father to have unauthorized or unsupervised contact with the minors and would work with service providers. The department indicated that it would like the discretion to release the children to mother with notice if it is able to work with her providers and counsel and ensure safety prior to disposition. The court ordered the children detained and granted the department's request for discretion to return the minors to mother with ten-day notice to all counsel. The department was ordered to provide services to

---

[2] Mother receives support services for a global developmental delay that can affect learning and memory.

parents pending the jurisdiction hearing, including parenting education, mental health services, and domestic violence services.

On September 11, the department filed a combined Jurisdiction/Disposition Report recommending that the court sustain the allegations contained in the petition, continue the children's detention, and offer reunification services to both mother and father. The social worker reported that on September 3 she had an interview with mother during which mother said that she "overreacted" when she called the police on the father, and that the children were taken from her because she called the police. She specified that she and father argue a lot, that father yells a lot when disciplining the children, and that he "has a bad temper." She said that his anger is "scary" and reported feeling unsafe at an 8 or 9 on a scale of 1 to 10. When asked about her plans to keep the children safe, mother responded that she would not allow father to chastise the kids and she would have his visits outside the home, with her mom present. While mother initially stated that she would not call her interactions with father "domestic violence," after the social worker described the cycle of violence and discussed behaviors of abusers, mother agreed that the conduct sounded familiar to her.

The Jurisdiction/Disposition report stated that mother had signed up for anger management classes and completed two classes by that time. The social worker spoke with the service provider and arranged for mother to enroll in domestic violence classes immediately. The social worker verified that mother was enrolled in parenting classes and had in-home support services

that were providing her with a full-time caregiver who transports her to and from appointments and helps her with daily living activities.  Finally, the social worker provided mother with referrals for individual counseling.

The Jurisdiction/Disposition report contained the department's assessment the minors would not be safe in mother's care due to her history of domestic violence with father, lack of insight into the actions of father being violent, prior violation of the safety plan, and her previous inability to protect M.P. from corporal punishment from father.  The social worker explained to mother at the September 3 meeting that "the Department is concerned that [mother] is saying calling the police was a mistake and doesn't feel that there is ongoing domestic violence . . . .  [C]alling the police was being protective of herself and her son but violating the safety plan and allowing father in the home[] shows that there are still some things she needs to be worked on."

A contested combined Jurisdiction/Disposition hearing was held on October 24.  In an addendum submitted before the hearing, the social worker reported that on September 15, she received a text message from mother in which mother accused her of "being a jerk" and wanting mother not to have her kids for the holidays because the social worker was in her "feelings about everything" because mother still gets along with her kid's father.  When the social worker responded that her job was to ensure the safety of the children and that mother was "missing the point in regards to the severity of the situation," mother responded with

6

several profanity-laced messages and then blocked the social worker's phone number. The addendum adds that on September 17, the social worker spoke with mother's case manager, who reported that the social worker could communicate with mother through her for the time being. The addendum also indicates that mother had enrolled in domestic violence classes and had completed one class.

Finally, the addendum reports that after a supervised visit on September 12, at which the visitation supervisor had to remind mother not to talk to her son about when he might be going home, mother sent an angry, profanity-laced text message to the visitation supervisor. The social worker reported that, at a supervised visit on September 26, security was brought into the visit and the visit was terminated after mother was repeatedly confrontational with the visitation supervisor. At the October 3 visit, mother responded, "I'm about to get irritated" when the visitation supervisor asked her to pay attention to her daughter who was engaging in dangerous behaviors. Following the September 12 visit, mother was referred to therapeutic visits and she completed her first visit on October 16.

At the hearing, mother explained that she understands that the department is concerned that she cannot keep her children safe, but she disagrees because she called the police for their protection.

With respect to her text messages to her social worker, mother apologized and acknowledged that she "overreacted and kind of, said some things [she] shouldn't have said." She

7

testified, however, that she still does not talk to the social worker directly and "will not talk to her at all." Regarding the issues at her visits, she claimed that the visitation supervisor "intentionally bullied me to the point where I had to have my in-home support worker sitting in those visits with me." On cross-examination, she confirmed that she had blocked both her social worker and the visitation supervisor on her phone. She was unwilling to unblock her social worker, but agreed that if a new social worker were assigned, she would not block the new social worker.

Mother acknowledged that she called father for help with diapers on August 3. She claimed that she did not understand that she was not supposed to reach out to him and that the department "made it seem like I was not trying to protect my kids because I called for help." She continued to justify calling him, explaining that her sisters and godmother were unavailable, she had just gotten out of the hospital, and her daughter was out of diapers. She needed help so she called "the only other person [she knew] would help." She agreed to her attorney's suggestion, however, that in the future if her family members were not available, she would call her in-home support worker. She confirmed that if father showed up at her home, she "wouldn't answer the door and [she] would call law enforcement." On cross-examination, she explained that she did not request a restraining order against father initially because "he had visitation where he was supposed to pick up my son every other weekend and he pays

8

child support" and that, as of the hearing, she had no need for a restraining order because they no longer talk.

Mother testified that since the incident, she is no longer in a romantic relationship with father and had not seen him since August 3 when he dropped off the diapers. On cross examination, she testified, "I don't even talk to him as far as like any of that. He doesn't come see me. He only asks about the kids and that's it. . . . I don't be anywhere near him. He don't be nowhere near me."

When asked whether she regretted calling the police on July 30, she responded, "[a] little bit." She explained that she did not know "that it was going to lead to them taking my kids" or that the police were "going to make another report to [child protective services]."

Mother testified that she had started the domestic violence treatment program and was learning how to tell the difference between a good and a bad relationship. She also testified, however, that prior to the July 30 incident, nothing had happened that would have led her to suspect that the children were not safe around father "because they have a good relationship." When asked about the previous dependency case, mother indicated she did not feel the prior domestic violence between her and father was harmful to her children because the violence was directed towards her and not the kids. She did not see the domestic violence between her and father as a "problem" because they "always go through something and make up." She did not believe the prior domestic violence impacted M.P. because

he was either not in the room when it occurred or because he was a baby and not "old enough to do anything."

The social worker, after confirming mother's participation in services, opined, "Based on the information that I received and my investigation, my interviews with the mother, her reactions to—myself as well as visitation social worker and interviews with the children, it was my assessment that . . . removal was the best option at this time so that [mother] could focus on herself and learn coping skills to manage her anger and to be able to refrain from domestic violence in order to keep the children safe." She did not believe there was an alternative to removal.

On November 12, 2025, the court sustained the allegations in the petition and found by clear and convincing evidence that there was a substantial danger to the physical health and emotional well-being of the minors and there were no reasonable means by which their physical and emotional health could be protected without removing them from their parents' custody. The court explained: "I believe that from listening to [mother] that she regrets calling the police because she did not expect that her children would be removed from her care and that their removal was surprising to her as in the previous case, [M.P.] was placed back in her care throughout the dependency proceeding." The court also noted that despite having a support system, including a support worker in her home from 10:00 a.m. to 6:30 p.m., and despite having signed a safety plan under which she agreed to call the police if father came to her home, mother "reached out to the father to assist her in getting diapers and

10

things for the baby on August 3, some four days after the incident in question." The court observed that, while it is clear that mother loves her children, she is not clear on how domestic violence can impact her children. The court cited the testimony set forth above in support of its belief that mother "is minimizing domestic violence and its effect on her children." Finally, the court noted that by refusing direct communication with her social worker, mother has made it nearly impossible for the social worker to assess her services and determine what additional services are needed so that the children can return home.

## DISCUSSION

Under section 361, subdivision (c)(1), a minor may be removed from the home only if the child protective agency establishes by clear and convincing evidence that (1) "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home" and (2) "there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." Under section 361, subdivision (e), the court must "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from their home" and "state the facts on which the decision to remove the minor is based" on the record.

Jurisdictional findings other than severe physical abuse of a child under the age of five do not result in a presumption in favor of removal. (*In re Zoe H.* (2024) 104 Cal.App.5th 58, 72.)

11

Instead, a juvenile court considers the current risk to the child given the parent's past conduct and present circumstances. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) It is not necessary to show prior harm to the child; rather, the statute focuses on averting harm. (*Ibid.*) We review the juvenile court's findings for substantial evidence keeping in mind the clear and convincing evidence standard. (*In re Zoe H., supra*, 104 Cal.App.5th at p. 71.)

Mother contends that, in making its dispositional findings and orders, the court minimized the services in which she was participating, such as parenting education, therapy, and domestic violence services, and instead focused on the original allegations in the petition regarding the physical violence in the home. She notes that, by the time of the hearing, she had terminated her relationship with father and agreed to follow the safety plan and call the police if father came to her home. She was enrolled and participating in anger management classes and individual therapy and was participating in a 12-week batterer's intervention program. In addition, she had a support worker in her home every weekday and had support from her two sisters and her godmother, whom she indicated she could call if she needed assistance. She argues that her voluntary acceptance of services, strong support network, and progress were evidence that the children would not be at risk if placed in her care under the department's supervision.

The standard of review, however, requires us to view the evidence "in the light most favorable to the prevailing party

below" (i.e., the department), and to give "due deference" to the juvenile court's resolution of conflicts in the evidence. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 996; see also *In re Cole C.*, *supra*, 174 Cal.App.4th at p. 918.) Here, the record contains ample evidence on which the court reasonably found that, despite mother's participation in services, the children would be at risk if placed in mother's care because she would likely permit father to have access to the children and that removal was necessary to protect the children.

Given mother's prior history with father, the trial court was not required to accept her testimony that she would abide by her safety plan going forward. And despite mother's participation in services, the court reasonably relied on evidence that showed that mother's understanding of domestic violence generally, and the impacts on children specifically, was limited at that time. Finally, although mother argues in her reply that she "physically and emotionally separated herself from Father, with whom she had been in a relationship for more than a decade," mother acknowledged at the hearing that she still communicated with father regarding the children.

The evidence also establishes, contrary to mother's argument, that the department made reasonable efforts to prevent the need for the children's removal, but that there were no reasonable means to protect the children without removing them from mother's care. The department's detention report indicates that it made reasonable efforts to prevent the need for the children's removal by meeting with mother and creating a

13

safety plan, but that the plan was ineffective because mother immediately violated it. The record shows that at the detention hearing, the department requested discretion to return the children to mother's care. Mother does not dispute that thereafter the department worked with her existing service providers to ensure her access to services and that she participated in those services. The record reflects, however, that mother demonstrated an inability to manage her anger and a refusal to communicate with the department. Mother suggests in her reply that "she remedied the situation by agreeing not to block the social workers from her phone and agreed to follow the Department's directions," but the record does not support her claim. As set forth above, she agreed only not to block a new social worker and continued to refuse direct communication with her existing social worker. Moreover, the court was not required to believe her testimony at the hearing when presented with evidence of her past conduct.

Finally, mother faults the court for failing to articulate what reasonable alternatives to removal were taken. We find no error. The court's citation of the evidence in its ruling is sufficient to comply with the requirement in section 361, subdivision (e), that the court state the facts on which the decision to remove the minor is based.

Accordingly, we find no error in the court's dispositional order removing the children from mother's care.

## DISPOSITION

The jurisdiction and disposition orders are affirmed.

GOLDMAN, J.

WE CONCUR:

STREETER, Acting P. J.
SWEET, J. *

---

*Judge of the Marin Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.