Filed 5/10/13  In re Maria M. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re MARIA M. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ELIZABETH C.,<br><br>Defendant and Appellant. | F065810<br><br>(Super. Ct. Nos. 11CEJ300249-1, 11CEJ300249-2)<br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from orders of the Superior Court of Fresno County.  Mary Dolas, Commissioner.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kevin Briggs, County Counsel, and William G. Smith, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Wiseman, Acting P.J., Levy, J. and Cornell, J.

Elizabeth C. appeals from the dispositional order removing her 17-year-old daughter Maria and three-year-old daughter Jacquelyn from her custody under Welfare and Institutions Code section 361.[1]  Elizabeth contends the order must be reversed because there was no evidence the children were at risk of harm in her care and there were less restrictive alternatives to removal.  We affirm the juvenile court's order.

## PROCEDURAL AND FACTUAL SUMMARY

Elizabeth and Dustin are an intact, married couple.  Elizabeth is the mother of three daughters, Marissa, an adult, and minors, Maria and Jacquelyn, the subjects of this appeal.  Dustin is Jacquelyn's father.[2]  He also has a teenage son, Jesse.

In November 2011, Fresno police officers were dispatched to Elizabeth and Dustin's apartment to investigate a disturbance.  The reporting party (RP), a neighbor, reported hearing a male yell that he was going to shove food down a juvenile's throat.  The RP also stated it sounded like the juvenile was being hit or slapped.  When the officers arrived, the RP confirmed that the disturbance was coming from Elizabeth's home.  She said the father was very abusive to the son and that the son was very quiet.  She said even the children in the complex were aware of the abuse.  She was concerned the juvenile was in danger of being seriously hurt by his father.

Dustin answered the door of his apartment, intoxicated and holding a beer.  The officers ran a criminal check on Dustin and discovered he had two warrants, one for a willful cruelty to a child stemming from a report of child abuse in March 2011 and the other for driving under the influence.

Then 17-year-old Jesse emerged from a back bedroom, wearing a T-shirt and very short shorts.  He appeared extremely emaciated and thin, was dirty and had body odor.  He told Officer Christopher Long that he had just taken a shower and took Long to a back

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]    Dustin did not appeal from the removal order as to Jacquelyn.

2

bedroom and into the bathroom where he said he was "on the wall." Jesse explained that being "on the wall' was being grounded. He said he was grounded "all the time." Jesse pointed to a chain at the top corner of the door and stated that Dustin and Elizabeth locked him in the bathroom. Long told Jesse to remain in the bedroom while he spoke to Elizabeth.

Elizabeth admitted confining Jesse in the bathroom but denied locking him in there. She said they put Jesse in the bathroom for everyone's safety and the lock on the door was to keep Jacquelyn from playing in the toilet water. Long noticed that the other bathroom in the apartment did not have a lock and that the only other room with a lock on the door was the room Jesse was sometimes allowed to sleep in.

Long returned to find Jesse in the bathroom staring at the walls. Long was concerned that Jesse either had a mental disorder or was mistreated to the point of having suffered psychological damage so he called for emergency services. Long asked Elizabeth if Jesse was medically evaluated. She said they took him to school counselors but Jesse refused to see a doctor or attend counseling sessions and she did not believe she could force him.

Dustin said that they had problems with Jesse lying and stealing and being disrespectful for four to five years. Dustin stated, "I don't care what he is doing as long as he keeps out of my way." Dustin admitted locking Jesse in the bathroom and bedroom at times. He said that evening Jesse did not want to eat. He slapped Jesse twice across the face when he discovered that Jesse tied a piece of string around one of his toes. He said Jesse occasionally tied string around his legs, abdomen and appendages to conceal them from Dustin. Dustin could not explain why Jesse did this.

Dustin also said that Jesse was not allowed to wear shoes, pants, socks or even a shirt while he was in the apartment to make sure he did not steal anything. Jesse could earn clothing back by good behavior. He said they provided Jesse pants, a shirt and shoes when he left the apartment. Dustin said Jesse was not attending school and they intended

3

to home school him. Long later discovered that Jesse's withdrawal from public school coincided with a complaint Jesse made that spawned a child protective services investigation.

Long also talked to Maria about the disturbance that occurred during dinner. She said she was sitting in the living room on the couch eating dinner and watching television. She said she did not hear any disturbance during dinner. Long estimated that the distance between the dining room table and the living room couch was approximately 15 feet. He asked Maria how it was possible that she did not hear anything given her close proximity. She responded that she was not paying attention and did not hear anything. Long concluded that Maria did not want to be honest and participate in the investigation.

Long reported that Dustin's dislike for Jesse was very clear. Dustin stated he did not care much for Jesse and wanted him to stay out of his way and not interfere with his time with "his girls." Long noted that Maria and Jacquelyn were clean, well dressed and well nourished. Long arrested Dustin on his outstanding warrants and he and Elizabeth were charged with willful cruelty to a child, false imprisonment and failure to provide. Maria and Jacquelyn were taken into protective custody by the Fresno County Department of Social Services (department) and placed in foster care.

Jesse was transported to the hospital because his heart rate dropped to a dangerous level while being evaluated by the paramedics. He was admitted and diagnosed with malnutrition. Upon admission, he weighed 115 pounds, placing him at the 50th percentile for height and the fifth percentile for weight. After four days in the hospital, Jesse weighed 128 pounds. His treating physician stated that his condition was severe and potentially life-threatening.

While hospitalized, Jesse provided more detail to the investigating officer. He said that his biological mother was schizophrenic and that she choked him, stabbed him in the head with car keys and beat him with some type of tool or wrench when he was six

4

years old. When he was 12 years old, he went to live with Dustin. He said he did not have a bedroom and slept in the bathroom or on the floor in the playroom that belonged to Jacquelyn. He said he was not allowed to sleep with a blanket and had "begged" for one. He said he did not report his mistreatment because his parents told him if he did anything aggressive he would be put in jail. He said he collected little things because he was creative and got bored. He went to bed and to the bathroom when given permission. He was required to leave the bathroom door open while voiding.

Jesse said he did not generally eat with the family and that Elizabeth prepared the meals. When he was allowed to eat at the same time as the family, he was not allowed to eat in their presence but was required to eat standing in the kitchen or in another room. He said on the night the police were called, he was fed a half a plate of vegetables around dinner time and told to go to his room while the rest of the food was prepared. At one point, Elizabeth checked on him and saw that he had tied a string around his toes. Dustin then came in and slapped him across the face approximately 10 to 20 times. He remained there until the police came. Elizabeth told him to tell the police he had just gotten out of the shower and to put a shirt on. He said approximately two months earlier, Elizabeth hit him on the back with a broken broom handle.

The RP told the investigating officer she was concerned that Jesse would be returned to his parents. She said she feared for some time that he would be killed. She said she heard Elizabeth on numerous occasions yelling at Jesse and saw Jesse digging in garbage cans, looking for food. She said on one occasion a neighbor offered Jesse food. When Elizabeth found out, she yelled at Jesse, stating "You don't f****** deserve to eat." She also heard Dustin yell on occasion, "I'll shove it down your f****** throat."

The department filed a dependency petition on behalf of Maria and Jacquelyn alleging there was a substantial risk that they would suffer abuse or neglect in Dustin and Elizabeth's care because Jesse was malnourished with a dangerously low heart rate while in their care. The petition also alleged that Dustin abused alcohol and that Maria's father

5

was incarcerated and unable to provide for her. (§ 300, subds. (b) & (g).) The petition was subsequently amended to include findings that Jesse gained at least 13 pounds in five days and was diagnosed with failure to thrive.

The department filed a separate dependency petition on behalf of Jesse because Elizabeth was not his biological mother.

The juvenile court ordered Maria and Jacquelyn detained and ordered the department to offer Dustin and Elizabeth parenting classes and mental health evaluations. The court additionally ordered Dustin to complete a substance abuse evaluation and submit to random drug testing. The court set the jurisdictional hearing for February 2012.

The juvenile court also ordered Jesse detained at a separate hearing but did not offer Dustin services. The juvenile court subsequently adjudged Jesse a dependent of the court and Dustin waived reunification services.

By February 2012, Elizabeth and Dustin were participating in parenting classes and Dustin completed a substance abuse assessment, resulting in referrals for intensive outpatient treatment and random drug testing. They also completed mental health assessments. The therapist that evaluated Elizabeth described her affect as "flat" and stated that Elizabeth showed little compassion for Jesse and denied any responsibility for his condition. The therapist questioned Elizabeth's truthfulness and recommended that she undergo a psychological evaluation. Similarly, the therapist who assessed Dustin recommended that he undergo a psychological evaluation.

In February 2012, the juvenile court convened the jurisdictional hearing and adjudged Maria and Jacquelyn dependents of the court after Elizabeth and Dustin waived their right to a hearing on the allegations. The court set the matter for a dispositional hearing in March 2012 and ordered weekly unsupervised visitation.

6

In March 2012, Elizabeth's attorney requested disclosure of mental health information from Jesse's case. Jesse's attorney invoked the psychotherapist-patient privilege on his behalf and the juvenile court denied the request.

Also in March 2012, Elizabeth and Dustin completed a Nurturing Parenting Program. The case manager reported that Elizabeth participated in group discussions but never mentioned Jesse and Dustin refused to discuss Jesse. The case manager was concerned about Elizabeth and Dustin's ability to provide a safe home for their children despite their completion of the program.

In its dispositional report, the department recommended the juvenile court order Maria and Jacquelyn removed and provide Elizabeth and Dustin reunification services. The matter was set for a contested hearing on the sufficiency of the evidence supporting removal. Specifically at issue was whether there was sufficient evidence that Maria and Jacquelyn were at a substantial risk of harm if returned to Elizabeth and Dustin's custody.

The dispositional hearing scheduled in March 2012 was continued and ultimately conducted in July and August of 2012. In the meantime, the juvenile court granted the department discretion to proceed to liberal visitation.

In July 2012, the juvenile court convened the contested dispositional hearing and heard testimony from Dustin, Elizabeth, Maria and social worker Kathleen Miller. Dustin and Elizabeth denied depriving Jesse of food. Dustin did not notice that Jesse had any medical problems. Asked how he explained Jesse's low weight, he testified it could be his metabolism because he was always active. Elizabeth did not notice that Jesse was thin and did not believe the medical reports that he was so thin he needed medical treatment. She said that Jesse skipped meals by his own choice. Dustin denied locking Jesse in the bathroom for timeout and he and Elizabeth denied refusing to discuss Jesse in the parenting class.

Maria testified that Dustin yelled and she was fearful for Jesse's safety but did not think Dustin would hurt Jesse. She said she noticed that Jesse was thin but did not

7

wonder why. She said he was a picky eater and was offered the same food as everyone else. She denied that Dustin deprived Jesse of food. She also denied seeing Elizabeth hit Jesse. She saw marks and bruises on Jesse but said he liked to hurt himself.

Kathleen Miller testified that overnight visitation had begun and the visits were positive. Dustin and Elizabeth were affectionate with Maria and Jacquelyn and there was a parent/child bond. She also testified that Dustin and Elizabeth completed a parenting class and that Dustin completed substance abuse treatment. However, Ms. Miller explained that the department was concerned that Dustin and Elizabeth's refusal to discuss what happened to Jesse could portend danger to Maria and Jacquelyn if they were returned home. In addition, neither parent was willing to undergo a psychological evaluation. Consequently, the department wanted to put a safety plan in place before returning the girls.

Ms. Miller further testified that Dustin suggested the department place the girls back in the home and conduct daily checks. However, the department did not believe that was an appropriate alternative to removal. Instead, the department believed the only way to evaluate the risk of returning the girls to their home was for Dustin and Elizabeth to participate in mental health services and develop a safety plan. She testified the risk of harm was returning the children without the parents having dealt with the issues that led to Jesse's abuse.

During argument, Dustin and Elizabeth's attorneys asked the juvenile court to return Maria and Jacquelyn to their custody under family maintenance. Minors' counsel joined with county counsel in arguing that the juvenile court order Maria and Jacquelyn removed and order Dustin and Elizabeth to participate in a psychological evaluation.

At the conclusion of the hearing, the juvenile court ordered Maria and Jacquelyn removed and ordered reunification services for Elizabeth and Dustin to include mental health and psychological evaluations. In doing so, the court stated in order to evaluate the risk, if any, to Maria and Jacquelyn, one had to "[look] into the parents' psyche." The

8

juvenile court further stated that Dustin and Elizabeth had not presented "even a base level" of understanding as to what happened with Jesse.

The juvenile court added another night to the overnight visits and ordered the department to evaluate the adult sibling, Marissa, for placement.

This appeal ensued.

## DISCUSSION

Elizabeth contends there was insufficient evidence to support the juvenile court's removal order. We disagree.

### I. Applicable law.

The standard for removal of a child from parental custody is found in section 361, subdivision (c) which provides, in relevant part,

> "A dependent child may not be taken from the physical custody of [a parent] with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence ...; ¶ [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c).)

"The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child." (*In re Cole C*. (2009) 174 Cal.App.4th 900, 917.) Although the juvenile court's findings must be based on clear and convincing evidence, we review an order removing a child from parental custody for substantial evidence. (*In re J.K*. (2009) 174 Cal.App.4th 1426, 1433.)

### II. The record supports the juvenile court's removal order.

Elizabeth challenges the removal order on three grounds: (1) the burden of proof was erroneously shifted to her; (2) there was insufficient evidence that returning Maria and Jacquelyn to her custody would expose them to substantial danger; and (3) the

department failed to show there were no reasonable means to protect Maria and Jacquelyn other than removal.

### A. *Burden of Proof*

Elizabeth's contention with respect to the burden of proof is as follows: County counsel and minors' counsel argued she did not benefit from services. Such argument demonstrates she was expected to prove she benefitted from services and Maria and Jacquelyn could be returned to her without risk of substantial danger. Therefore, instead of requiring the department to prove that returning the children to her custody would expose them to substantial danger, she contends, the burden was erroneously shifted to her to prove that substantial danger did not exist. The record, however, does not support Elizabeth's contention. Counsel's statements regarding benefit from services were made in the context of Elizabeth and Dustin's lack of understanding of the harm they caused Jesse. There is simply no evidence that anyone but the department bore the burden of proving substantial danger.

### B. *Substantial Danger*

Elizabeth contends the department failed to show how her handling of Jesse ("an extremely troubled teenager") evidenced a substantial danger to Maria and Jacquelyn. We conclude the record amply portrays the risk of danger. Jesse was severely and systematically abused while in Elizabeth's care yet Elizabeth refused to admit that obvious fact. She did not accept the medical evidence that he was malnourished and failing to thrive. In addition, Elizabeth was not concerned about Jesse's condition. She did not inquire about him and refused to discuss him. One has to presume that cruelty of that magnitude without explanation makes the person inflicting it inherently dangerous. Thus, it is reasonable to conclude that Maria and Jacquelyn could be at substantial risk in Elizabeth's care even though she had no history of mistreating them and apparently took good care of them.

*C. Alternatives to Removal*

Elizabeth contends family maintenance was a reasonable alternative to removal because she could have addressed the department's concerns (i.e. mental health counseling and safety network) while under such an arrangement. She cites two cases, *In re Henry V.* (2004) 119 Cal.App.4th 522 (*Henry V.*) and *In re Jeannette S.* (1979) 94 Cal.App.3d 52 (*Jeannette S.*), that resulted in reversal of a removal order and contends her case compels the same result. We disagree.

In *Henry V.*, the court reversed the removal order of a child who sustained burn marks of undetermined origin and whose mother had bonding deficiencies. (*Henry V.*, *supra*, 119 Cal.App.4th at pp. 527, 531.) The court reasoned the physical abuse was a single occurrence and the mother was fully cooperative in taking advantage of the services offered to her. In addition, removal had been premised on the need to complete a bonding study but there was no evidence the study could not occur with the child living at home. Rather, the social worker acknowledged that in-home bonding services, unannounced visits and public health nursing services could address the bonding issue and mitigate the risk of further physical abuse. (*Id*. at p. 529.)

In *Jeannette S.*, the mother and father were divorced. Social workers had visited the mother's home and "found it dirty and cluttered with debris. There were extensive dog feces on the kitchen floor and cat feces in the bathroom. The house smelled of urine and there was spoiled food on the stove. [The minor] had been forced to sleep on the couch in the living room because her bedroom was such a mess." (*Jeannette S.*, *supra*, 94 Cal.App.3d at pp. 55-56.) This court, however, found the juvenile court's dispositional order removing custody from the parents was inappropriate because the juvenile court had two reasonable alternatives to removal. It could have imposed "stringent conditions of supervision by the welfare department with the warning that if [the mother] again let her house get filthy or failed to keep [the minor] in clean clothes

11

and to properly care for her that appellant would lose custody of the child."
Alternatively, the court could have placed the minor with her father. (*Id*. at p. 60.)

We find *Henry V.* and *Jeannette S.* distinguishable on several key points. Unlike *Henry V.*, Jesse did not suffer a single incident of child abuse. Instead, his abuse was ongoing and methodical. Further, unlike the mother in *Henry V.*, Elizabeth did not take full advantage of the services offered to her. Rather, she refused a psychological evaluation and did not discuss her abusive behavior in parenting sessions. Unlike *Jeannette S.*, Maria and Jacquelyn could not be placed with their fathers. Maria's father was incarcerated and Dustin was considered as big a threat to Jacquelyn as Elizabeth. Finally, unlike *Henry V.*, the department in this case did not believe that daily checks on the family were sufficient to protect Maria and Jacquelyn from harm. Further, the evidence does not support imposition of stringent conditions such as those contemplated in *Jeannette S.* Stringent conditions may be effective where the evidence of abuse or neglect is readily apparent such as a dirty and hazardous home. However, Jesse's abuse was only apparent because it had reached the point where he needed medical attention. Such subtle and insidious abuse is not readily apparent or necessarily detectable by stringent conditions of supervision.

We concur with the juvenile court that Elizabeth's unexplained physical abuse of Jesse posed a substantial danger to Maria and Jacquelyn if they were returned to her custody. We further concur that there were no reasonable alternatives to the children's removal until Elizabeth was willing to examine the cause of the abuse through mental health services.

Thus, we conclude substantial evidence supports the juvenile court's dispositional order removing Maria and Jacquelyn from Elizabeth's custody and affirm.

## DISPOSITION

The dispositional orders entered on August 6, 2012, are affirmed.

12