Filed 11/7/13  In re Thomas L. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re THOMAS L., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, Plaintiff and Respondent, v. FERNANDO L., Defendant and Appellant. | F067163 (Super. Ct. No. 516562) **OPINION** |

### THE COURT[*]

APPEAL from orders of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Caitlin U. Christian, under appointment by the Court of Appeal, for Defendant and Appellant.

John P. Doering, County Counsel, and Carrie M. Stephens, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P.J., Cornell, J. and Poochigian, J.

Fernando L. (father) appeals from the juvenile court's dispositional order removing his nine-year-old son, Thomas, from his custody under Welfare and Institutions Code section 361.[1] Father contends the order must be reversed because there was no evidence Thomas was at risk in his care and there were less restrictive alternatives to removal. We affirm the juvenile court's order.

**PROCEDURAL AND FACTUAL SUMMARY**

Father has two sons, nine-year-old Thomas, the subject of this appeal, and 14-year-old Alexander. Dora, father's ex-girlfriend, is Alexander's mother. Vanessa, father's wife, is Thomas's mother. Because Thomas's detention and removal stems from father and Vanessa's mistreatment of Alexander, we incorporate Alexander's history into our summary of the case.[2]

Father has a history of domestic violence referrals beginning in 2000, in Santa Clara County. In March 2000, Dora reported multiple incidents of domestic violence in which father assaulted her; striking her head, stomach, chest, back and legs with his fists. At the time, Alexander was 11 months old and father and Dora shared custody of him. There were two additional reports of domestic violence in 2000, stemming from arguments father and Dora had while exchanging custody of Alexander.

When Alexander was five years old, he was removed from Dora's custody because of her drug use and neglect and was placed with father, who was granted full custody of him. By that time, father was involved with Vanessa, and Thomas was an infant.

In November 2005, eight months after Alexander was placed with father, the Stanislaus County Community Services Agency (agency) received a report that Vanessa

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]     We took judicial notice of the appellate record in Alexander's case (F067160) at appellant's request.

2

hit Alexander in the face because he "got his numbers wrong." Alexander had facial bruising, a cut lip, and a bloody nose. Alexander stated he knew Vanessa did not like him because she was mean to him, but said he loved her. Father begged the agency not to place Alexander in foster care and said he would keep Alexander out of the home until the next day. Vanessa denied hitting Alexander and she and father agreed to participate in family maintenance services.

By late February 2006, father and Vanessa had made an appointment for parenting classes, and the agency reported Vanessa and father were following their case plan. At the same time, however, the agency received a report that then six-year-old Alexander was found wandering in the street. Over the ensuing five months, the social worker had monthly contact with the family except for March and May when the social worker attempted home visits but no one answered the door. In May of that year, Alexander stated in class that he was angry and wanted to kill himself. When the social worker saw Alexander and Thomas, they appeared happy and clean. In July 2006, the social worker asked Vanessa if she wanted to continue receiving family maintenance services and Vanessa said she did not. The social worker closed their case because the children appeared safe and the parents were not willing to cooperate.

In January 2008, the agency received a report that Vanessa made Alexander stand outside naked because he got in trouble. Vanessa denied the allegation, and Alexander recanted his story. Alexander said he defecated in his pants and Vanessa had made him strip off his clothes in the entry way of the home. The tile in the entry way was cold and that made him angry at her. The agency could not substantiate the report since the family denied it, but the family was receptive to Alexander receiving counseling.

In July 2009, while staying with Dora, Alexander reported that Vanessa slapped him on the right side of his face causing bruises, and pinched him on the legs causing them to bleed. He said he was afraid of Vanessa and did not want to return to his father's house. He did, however, return and was interviewed by a social worker from the agency.

He denied that Vanessa and father hit him. According to the social worker, Alexander and Thomas presented as healthy, intelligent boys. The social worker believed that Alexander may have been encouraged to change his story, but the agency was unable to substantiate the physical abuse allegation.

In December 2009, Alexander reported at school that he wished he were dead, that father did not give him dinner the night before or breakfast that morning, and that father punched him in the arm and stomach. Alexander, however, did not have any bruises and did not appear afraid of father.

In March 2011, the agency received a referral that Thomas, then six years old, returned to school after three days of absence with a swollen and bruised ear. Thomas said he and father were playing when father got mad and kicked him in the face. The agency investigated but determined father did not physically abuse Thomas, and the family agreed to modify their wrestling activities.

In January 2012, father and Vanessa reported to a mandated reporter that they threatened to beat Alexander until he was "black and blue." They did not allow him to sleep on a mattress because he urinated on it and they did not permit him to eat in the school cafeteria. He was not allowed to eat breakfast or lunch in the school as punishment for misbehavior. The agency did not intervene because Alexander did not report he was hungry and because he, Vanessa and father were in counseling.

In March 2012, the agency received reports that Vanessa had removed Alexander's bed and carpet, and he slept naked on the floor with two sheets. The carpet was removed because Alexander defecated and urinated on the floor deliberately. Alexander disclosed that he was not fed at home for several days in a row and not permitted to eat at school. He was made to wear soiled clothes for several weeks and not allowed to change his soiled underwear. In addition, Alexander had to run back and forth to school, and he was hit and pushed at home. He was allowed six minutes to arrive home after school. Once he arrived, he was locked in his room and had to call for

4

bathroom breaks and for dinner. Alexander was told daily that he was going to be sent to a foster home and feared for his safety. He appeared underweight and had been diagnosed with attachment disorder. He was participating in counseling but father and Vanessa were not.

In March 2012, the social worker helped the family develop a verbal contract with Alexander, and he responded well for several days, but then resumed urinating in his clothing. In April, father told Alexander to pack his belongings and not return to the home after school. Alexander reported at school that he had nowhere to go and was scared and sad. By May, father and Vanessa were no longer giving Alexander sheets. He was not allowed to sit on the furniture or wear clothes.

In May 2012, Alexander was evaluated by psychologist James A. Wakefield, Jr. Dr. Wakefield reported that Alexander was exposed prenatally to drugs and to maternal drug use until the age of five. Thereafter, he was exposed to inappropriate punishment in father's home, resulting in his admitted use of enuresis, encopresis and feces smearing in retaliation. Dr. Wakefield further reported that Alexander was of average intelligence and was not having behavioral or academic problems at school. However, he opined that Alexander was emotionally disturbed and had been so for a long time. He said Alexander was engaged in a power struggle with his parents and he was not controlled by punishment. Dr. Wakefield diagnosed Alexander with schizoaffective disorder and reactive attachment disorder, recommended continuing counseling and suggested father takeover as the primary disciplinarian.

In July 2012, a social worker reported that father and Vanessa refused to let Alexander participate in treatment. She further reported that after Alexander fulfilled a goal, Vanessa increased her expectations and consequences, and that father used punishment to humiliate Alexander. She further stated father and Vanessa "shut down every avenue the family's counselor suggested to decrease Alexander's target behaviors," and when father was asked to participate in treatment, he declined to do so.

5

In September 2012, Vanessa and father agreed to participate in family maintenance services. However, they refused to sign a case plan that included Thomas. Consequently, in November 2012, the agency closed their case.

In January 2013, the agency received a report that Vanessa burned Alexander's hand. Alexander said she held his hand over a hot pan and burned his wrist. The day before, she hit him on the hand with a baseball bat for taking a pen.

The agency took then 13-year-old Alexander into protective custody, placed him in foster care and filed a dependency petition amended to allege he was a minor described under section 300, subdivisions (b) (failure to protect), (c) (serious emotional damage) and (i) (cruelty). Approximately a week later, the agency took then eight-year-old Thomas into protective custody out of concern that he was exposed to the emotional abuse inflicted upon Alexander. The agency filed a dependency petition alleging that Thomas was described under section 300, subdivision (b) and (j) (abuse of sibling). Thomas was also placed in foster care.

Thomas described how he and Alexander were treated differently in the home. Thomas said sometimes Alexander only ate a cheese sandwich while the rest of the family ate chicken, vegetables and potatoes. He said Alexander was locked in his room while the rest of the family went on outings and for Christmas Thomas received games and toys while Alexander received an empty box with a note from Santa Claus telling him he was too bad to receive presents. Thomas said he also wet the bed but did not get into trouble. Thomas also explained that he let Alexander out of his room at night so Alexander could go to the bathroom and took him back to his bedroom.

Thomas reported his parents disciplined him by making him stand next to a wall without his hands touching the wall. Sometimes his parents yelled at him, sent him to his room, spanked his bottom with a spoon, punched him in the stomach or took things away from him.

The juvenile court ordered Alexander and Thomas detained and set their jurisdictional/dispositional hearings (combined hearings) in February 2013.

After a month in foster care, Alexander was no longer smearing feces and defecating and urinating in his clothes and bedding. He said he felt safe and loved and was doing well in school. The foster parent reported that he tried to please others but was unsure of social expectations and became frustrated as a result.

In its report for the combined hearing as to Alexander, the agency recommended the juvenile court use caution in considering Dr. Wakefield's psychological evaluation of Alexander since much of the background information was provided by father and Vanessa. The agency recommended the juvenile court offer Dora reunification services but deny them to father.

In its report for the combined hearing as to Thomas, the agency recommended the juvenile court adjudge Thomas a dependent child, remove him from father and Vanessa's custody and order reunification services for them. The agency reported that father completed a drug and alcohol assessment but did not require substance abuse treatment. In addition, he and Vanessa completed a clinical assessment with clinician Amy Coleman, who recommended they participate in individual counseling. In addition, they participated in parenting classes and individual parenting sessions but it was too soon to assess their progress. They regularly visited Thomas and were sad and cried at the end of visits.

The agency advised the juvenile court that despite father and Vanessa's progress, they did not recognize they subjected Alexander to emotional cruelty and exposed Thomas to it. Consequently, the agency could not recommend family maintenance services.

In April 2013, the juvenile court conducted a contested combined hearing as to Alexander and Thomas. Ms. Coleman testified father and Vanessa were participating in the parenting program, which consisted of 10 weeks of classes, followed by 10 individual

7

parenting sessions and a minimum of three parent/child labs.  She said Vanessa and father had been participating in individual parenting sessions with her for approximately a month and a half.  Vanessa participated in five individual counseling sessions and father participated in two.  Coleman also co-facilitated two of the eight group parenting classes they attended.  During the group sessions, they covered stress, anger management, and safety.

Ms. Coleman further testified that during father's two sessions, they discussed the reason for his referral for counseling and how his upbringing influenced his parenting style.  She said father and Vanessa believed Thomas was removed from their custody in order to protect him from Alexander.  They both acknowledged treating Alexander differently but only father provided an explanation; Alexander and Thomas had different needs.

Ms. Coleman testified it was too early to determine if father and Vanessa made progress in their parenting services.  There were additional topics she planned to discuss with them such as their prior child welfare history and their method of disciplining Alexander.  Ms. Coleman declined to give an opinion as to whether it was safe to return Thomas to father and Vanessa's custody, explaining that it was beyond the scope of her professional duty.

Social worker Sarah Hernandez testified concerning a risk assessment tool, structured decision-making (SDM), used by the agency to determine a parent's risk level with respect to a child.  She testified that, according to the results of Vanessa's SDM assessment, Thomas was at high risk for abuse.

During argument, county counsel asked the juvenile court to sustain the petitions, deny father reunification services as to Alexander, and provide father and Vanessa reunification services as to Thomas.

The juvenile court sustained the allegations in the petitions and ordered Alexander and Thomas removed from parental custody.  The juvenile court ordered reunification

8

services for Dora and father as to Alexander despite the agency's recommendation to deny father services. The court explained that denying father reunification services would send Alexander the message that he was going to be treated differently again and that it may be in his best interest to attempt reunification with father. The juvenile court ordered reunification services for father and Vanessa as to Thomas. This appeal ensued.

## DISCUSSION

Father contends there was insufficient evidence to support the juvenile court's removal order. We disagree.

Section 361, subdivision (c), the removal statute, prohibits the juvenile court from removing a minor child from the physical custody of the parent(s) with whom the child resided at the time the petition was initiated unless the juvenile court finds clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's … physical custody." (§ 361, subd. (c).)

"The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

> "In reviewing the sufficiency of the evidence on appeal, we look to the entire record to determine whether there is substantial evidence to support the findings of the juvenile court. We do not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order, and affirm the order even if there is other evidence that would support a contrary finding. [Citation.] When the [juvenile court] makes findings by the elevated standard of clear and convincing evidence, the substantial evidence test remains the standard of review on appeal. [Citation.] The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order. [Citations.]" (*In re Cole C.*, *supra*, 174 Cal.App.4th at pp. 915-916.)

9

In our view, father failed to meet his burden.

Father contends there was insufficient evidence that returning Thomas to his custody would pose a substantial danger of emotional harm to Thomas because Alexander was the cause of the inappropriate discipline and Alexander was no longer in the home and unlikely to return. Further, father contends there was no evidence Thomas was inappropriately disciplined or would be because, unlike Alexander, Thomas did not have behavioral problems. Finally, father contends Thomas's sadness and difficulty adjusting to foster care demonstrated that removing him from father's custody was more harmful than returning him.

In effect, father cites evidence to support an order returning Thomas to his custody rather than to support the removal order issued by the juvenile court. Our role, however, is to determine whether substantial evidence supports the order actually made. In our opinion, it does.

For eight years, father and Vanessa cruelly abused Alexander physically and emotionally. When their punishments did not work, they intensified them. By the time Alexander was finally removed, he was being denied food and virtually all the comforts of a home. To make matters worse, Thomas had become an unwitting participant in his brother's abuse.

In our view, substantial evidence supported a finding that Thomas would be at a substantial risk of harm if returned to father's custody. Father has a history of violence, as evidenced by his interactions with Dora. In addition, he either passively stood by while Vanessa abused Alexander or actively participated in the abuse. His claim that Alexander's behavior is the genesis of the abuse is not supported by the record. Vanessa was abusing Alexander within eight months of his placement with father, not because he was misbehaving but because he "did not get his numbers right." Eventually, Alexander acted out in response to the abuse and the abuse escalated in intensity. Once Alexander was taken out of the home, his behavior improved. Under the circumstances, there is no

10

reason to believe that Thomas would not be targeted in a similar fashion if he were the only child in the home.

Father cites this court to *In re Hailey T.* (2012) 212 Cal.App.4th 139 for the proposition that the abuse of one child does not justify the removal of the child's sibling. (*Id.* at pp. 147-148.) *Hailey T.*, however, is easily distinguishable. In that case, a four-month-old sustained bruising on and underneath his eye. He and his three-year-old sister Hailey were removed from parental custody. The parents could not explain the injury and a child abuse expert testified the injuries were nonaccidental and unlikely inflicted by Hailey. The expert could not tell if the injuries were sustained during a single or multiple episodes. Another expert testified that it was impossible to determine if the injuries were caused intentionally and that they could have been caused by Hailey. (*Id.* at pp. 142-144.)

The appellate court in *Hailey T.* reversed the juvenile court's removal order, concluding there was insufficient evidence to order Hailey removed from the home because there was no evidence of any abuse and the evidence of abuse was disputed. (*Hailey T.*, *supra*, 212 Cal.App.4th at pp. 148-149.)

In this case, there was ongoing child abuse.

Father also contends there were alternatives to removal such as frequent unannounced home visits and in-home services to address safety, stress management and appropriate discipline. Father also points out that Thomas was under the continuing supervision of the juvenile court, the social worker and family counselor, and therapists who could detect if Thomas was at risk.

The evidence strongly suggests, however, that the alternatives father suggests would not suffice. There is more than one instance of father and Vanessa persuading Alexander to recant his allegation of abuse. No amount of supervision can protect a child in an abusive home if parents prevent the child from disclosing the abuse to authorities.

11

In light of the foregoing, we conclude substantial evidence supports the juvenile court's removal order.

## DISPOSITION

The dispositional orders entered on April 19, 2013, are affirmed.