Filed 1/17/14  In re James P. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re JAMES P., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNTY SERVICES AGENCY,  Plaintiff and Respondent,  v.  TIFFANY P.,  Defendant and Appellant. | F067473  (Super. Ct. No. 515877)  **OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

John P. Doering, County Counsel, and Carrie M. Stephens, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

This appeal involves a family with an extensive history in the dependency system. Mother, Tiffany P., appeals the juvenile court's May 2013 order following the 12-month review hearing, finding that return of her five-year-old son James P. to her care and custody would create a substantial risk of harm to the child.[1]  Finding no error, we affirm.

## BACKGROUND

On September 13, 2010, the Stanislaus County Community Services Agency (Agency) filed a petition, which set forth nine allegations as to mother's unfitness for custody of her children James and Hailey, under Welfare and Institutions Code section 300, subdivision (b).[2]  Mother had been locking the children in a bedroom for long periods of time.  The children were removed from mother's care; James was placed with his father; and Hailey was placed in the home of a friend of mother's.  Mother was pregnant with her son Daniel at the time.  Several days after his birth, he was also removed from mother's physical custody and placed in the same home as Hailey.

A psychological assessment on mother found her to have an adjustment disorder with depressed mood, a history of bulimia, and a personality disorder.  Although mother had already received three years of parenting instruction from Parent Resource Center, including in-home mentoring, she was not able to translate the knowledge into appropriate actions.  An evaluation on James found that he fell into the mild to moderately severe category of autism.

At a joint jurisdictional and dispositional hearing in December of 2010 and January of 2011, the juvenile court found that James, Hailey, and Daniel were persons

---

[1]     James is the oldest of mother's six children and the only child at issue in this appeal.

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

described by section 300, subdivisions (b) and (g) and that removal of the children from mother's physical custody was appropriate.

Mother filed an appeal from the section 300 disposition findings and orders. On November 14, 2011, this court issued its opinion in the appeal (*In re James P. et. al.* (Nov. 14, 2011, F061732) [nonpub.opn.]) and ordered a new disposition hearing. We found that the juvenile court "could have imposed stringent conditions, including frequent unannounced in-home visits, for mother on her use of the lock to confine her children, and on following the advice given her by social workers and service providers as to her parenting behavior and mental health." James and Hailey were returned to mother's care. Daniel was released to the custody of both his parents, with the primary residence being with his father.

Slightly more than a month later, on February 23, 2012, the Agency filed a section 387 supplemental petition again seeking removal of the children from mother's home. James and Hailey were detained and Daniel remained in his father's custody. The petition described a series of issues that had arisen over the course of the six weeks since the minors began extended visits in mother's home and were subsequently returned.

A contested detention hearing began on March 1, 2012. Following the testimony of various service providers, the parties agreed that Hailey would return to mother's care, but that James would continue in foster care and Daniel in his father's care.

At the contested jurisdiction/disposition hearing, which spanned over several days and concluded on May 11, 2012, the juvenile court sustained the petition, finding that mother was unable to safely care for all three children, or even two children, at the same time. Specifically, the juvenile court found mother was not able to care full time for James at that point. The court found that the number of injuries to the children, albeit small, demonstrated by clear and convincing evidence that they were at a substantial risk of harm. The court noted that, although several of the service providers testified that

mother did okay supervising the children, it was always in a situation where there were other adults present. The court found that mother's testimony lacked credibility.

The juvenile court ordered that Hailey remain in mother's care with family maintenance services; that James be removed from mother and father's care and placed in foster care with reunification services; and that Daniel be removed from mother's custody but remain placed with his father and reunification services ordered.

Mother appealed the orders from the section 387 hearing removing James from her care. On September 11, 2013, this court issued its opinion affirming the orders (*In re James P., et. al.* (Sept. 11, 2013, F065284) [nonpub.opn.]).

By the time of the six-month review hearing on December 12, 2012, mother was living in a three-bedroom apartment with her roommate Brian H., Hailey and her new baby, Aubrey, who was not a dependent of the court.[3] At the six-month review hearing, the juvenile court continued mother's reunification services and terminated reunification services for James's father. The court authorized the Agency to begin James's trial visits in mother's home.

The report prepared in anticipation of the 12-month review hearing recommended continued services for mother with James, who was still in foster care. James was reported to be happy and thriving in foster care.

The report addressed the issue of James's extended visits with mother. At the beginning of the reporting period, James had up to four-night visits with mother, but those were scaled back after concerns about his health emerged. In November of 2012, the foster parent noticed that, for several weeks, when James returned from his visits, he was very lethargic and fatigued. He was a normally very active child and this was a dramatic change. A doctor's visit revealed that James was dehydrated. Also in November of 2012, after mother changed her story and now said she knew Aubrey's

---

[3] Mother claimed Aubrey's father was a "sperm donor."

4.

father, mother took Aubrey to visit her father in West Virginia, leaving Hailey with Brian and cancelling her visits with James.

On Monday, December 17, 2012, mother called the social worker and told her that James had had a fever of 103 degrees and a seizure and bloody nose on Sunday the 16th, and she had rushed him to the emergency room. Mother was told to follow up with James's primary care physician. Later that same day, mother called a different social worker and said that James had had a fever of 105 degrees and a minute-long seizure on Saturday the 15th, and that she did not take him to the emergency room until Sunday afternoon. According to mother, she needed the Agency to sign off on a medical authorization for a Dr. Mielke's office for further care.

Dr. Mielke was not James's primary care physician, but instead an autism specialist. Mother was referred to Dr. Mielke through an organization called Generation Rescue. Mother had obtained a grant from Generation Rescue to enroll James in the program. The grant would provide funds for two visits with a physician trained in treating autism, a 90-day supply of vitamins, minerals and supplements, a stool analysis test, a urine test, a parent mentor, dietary intervention training, a "Sound Brain Fitness Training," and discounts on further supplements.

One of the social workers contacted Dr. Mielke's office and discovered that mother had not informed the office that James was a dependent of the court and needed Agency authorization to continue treatment. Dr. Mielke informed the social worker that she would be working with mother to treat the "symptoms" of James's autism. The social worker informed Dr. Mielke that she would have to get supervisor approval before consenting. James's primary care physician was not aware that James was in a specialized autism treatment program and was concerned that some of the supplements might be harmful to James.

Mother became incensed that treatment authorization for Dr. Mielke was not immediately forthcoming and claimed that James, who was now with his foster mother,

5.

was getting worse, not better. The foster mother noted that James was improving but still had a fever and she was taking him to see his primary care physician. Mother went along to the appointment, told the primary care physician James could no longer be seen by him, and attempted to get the physician to make a referral to Dr. Mielke.

After a staffing meeting, mother was told that she would no longer have overnight visits with James because she failed to get James immediate medical attention when needed. Mother stated that, if she could not have James for five days at a time, she would rather not have him at all because it was too hard emotionally for her. Mother then launched into a series of phone calls and e-mails justifying her actions in not taking James to the emergency room. She accused the Agency of medical neglect. She sent pages of advice from the Internet regarding when a parent should take a child to the emergency room. Mother described how she disagreed with the emergency room physicians and told them they needed to do a white blood cell count and an MRI, which they did not believe was necessary.

Dr. Mielke's office would not accept Medi-Cal and mother wanted the Agency to pay for treatments, tests, and supplements over and above those covered by the grant. Mother was told that the Agency could only pay for items not covered by Medi-Cal that were medically necessary.

Mother's e-mail continued in pages and included links to purported case law. The Agency asked mother to limit her e-mails to 100 words. The Agency noted that the e-mails were rambling and raised concerns about the amount of time mother was spending writing them rather than caring for the two children in her care.

On January 11, 2013, James's foster mother reported that James, who had been healthy since the fever incident, came home with all-day diarrhea after a visit with mother. Part of Dr. Mielke's treatment for James involved a gluten/casen free diet. Mother regularly reminded the foster mother of this requirement. Mother promised that

she would provide gluten-free school lunches for James during the week, but she brought only one lunch and did not follow through after that.

James's teacher noted that, on the days after visits with his mother, James had behavioral problems, including biting, kicking and punching. He also wore the same clothing two days in a row when he was with mother.

James's primary care physician opined that, while the tests and supplements provided by Dr. Mielke were reasonable, they were not medically necessary. Mother frequently requested a meeting to which she could bring herself, her roommate Brian, an autism advocate and her attorney to address the alleged lack of medical treatment of James, but when asked to come in to meet to discuss her case plan, she stated it was not necessary.

Overnight visits for James with mother were reinstated on January 18, 2013. The following day, mother sent an e-mail asking the social worker to arrange for collecting a stool sample from James for a test by Dr. Mielke. The sample would test for toxic metals in James's system. The Agency explained that mother would be financially responsible for the test.

On January 24, 2013, James's school called to say that he was wearing the same clothes as the day before and also that he looked tired and was coughing. Mother's roommate Brian told the school staff that James woke up itching and could not sleep, so he played video games and watched television at 2:30 a.m. James's foster family noted that James's fidgeting behaviors increased after visits with mother, and he did not use his words as much.

In response to the school's concern, Mother wrote a lengthy e-mail to the Agency at 3:00 a.m. regarding James's itching and eczema, along with information on eczema downloaded from the Internet. According to mother, she wrote her e-mails in the middle of the night when the kids were asleep or when Brian watched them.

On January 30, 2013, the Agency received an anonymous letter from an individual concerned about Facebook posts made by mother "practically every 15 minutes" stating that she was giving James melatonin to make him sleep all day and he was sick, dying, or needed to see a doctor at 2:00 a.m. The writer was concerned about the reported treatment, but also mother's availability to parent her three children if she was posting on Facebook so often. One of mother's posts showed a photo of herself holding up a poster that read: "The Agency said if I get 100,000 likes, that my son can get the specialized medical care he needs! He is 5 yrs, has autism and was being medically treated for A S Disorder, immune dysfunction, nutritional deficiency, yeast infection, intestinal disorder which has stopped because they said 'medi-cal wont cover it' but if he gets 100,000 likes he can."

Also on January 30, 2013, the social worker received a request from mother's attorney asking that she be referred to the public health nurse or health education program for the children. The social worker immediately added James to the public health nurse referral for the nurse already working with mother regarding Hailey and Aubrey.

The following day, on January 31, 2013, the social worker met with mother and therapist Maryanne Cose in attempt to get mother back on track with her reunification plan. Mother disclosed that she was off her medication and had procrastinated in getting an appointment with her doctor. She claimed to have deactivated Facebook. The social worker, therapist and mother discussed how she seemed to sabotage herself every time she was close to a trial visit, by doing something to jeopardize it. A plan was agreed to, which included mother listening more and working with the therapist on her anxiety issues. She was to make a doctor's appointment immediately. Overnight visits would resume when she was back on her medication and seeing the therapist.

The following day, mother called to say she had a doctor's appointment, but it was not until March 1 and she thought it was unfair to withhold overnight visits that long. A staffing meeting determined that the plan would be adhered to. Mother then called to say

8.

that she did not think her lack of medication interfered in her ability to parent. Two days later, mother asked to shorten her Sunday visit with James because of the Super Bowl.

On February 7, 2013, a social worker made an unannounced visit to mother's home while James was there. The social worker noticed a sour smell, which turned out to be rotting chicken. The floor was dirty and clothing was piled on the floor and a mattress. Mother explained that she and Brian slept on the mattress and Audrey slept on the floor next to them. Mother promised to get a crib for the baby and said she and Brian would move back to the upstairs bedroom. Over the next few days, mother made multiple calls and sent multiple e-mails justifying the condition of her home.

On February 13, 2013, the Agency learned that mother was again pregnant, this time with twins due in August of 2013, whom she planned to give up for adoption to her friend who lived in another state. Mother's roommate, Brian, who was the father of the unborn babies, agreed with the plan of adoption. In order to accomplish this, mother was going to take Hailey and Aubrey with her to the other state four to six weeks prior to her due date so that delivery could happen where her friend lived. She would leave James with his foster family and "Skype" him while she was gone. Because of her pregnancy, mother stated that she could not take at least one of the medications she had been taking. Mother's doctor subsequently determined that she should not take any psychoactive medications while pregnant.

Mother cancelled her February 15, 2013, visit with James in order to take the GED test.

As soon as James was added to the public health nurse's caseload, mother became uncooperative and refused to see the public health nurse. In a subsequent discussion with the social worker, mother insisted that her needs were to learn how to manage her own ADHD and anxiety without medications and the pregnancy had nothing to do with James or her ongoing dependency case.

At the hearing on April 16, 2013, mother's counsel stated that James had mercury poisoning and required chelation therapy and mother wanted to know if that had been started. The agency, which did not oppose the therapy, stated that the matter was "in process." The 12-month contested review hearing was scheduled for May 2, 2013.

On April 24, 2013, James was ill at school and, because it was mother's day for a visit, mother was called to pick him up. It took mother two hours to arrive. The following day he returned to school, still sick. When the school called mother to again pick him up, she claimed it was "just the way he acts sometimes" and refused. After James threw up, mother was again called. This time mother stated that James typically threw up when he coughed and she was not coming to get him. Insisting that she come, she arrived an hour and a half later. James's teacher reported that, on the days mother is scheduled to pick up James, she routinely arrived a half hour late. The teacher also stated that, prior to Christmas, when James had overnights with mother, he would come to school tired and dirty. Mother told the teacher that James did not sleep well because he wanted to stay up and play video games.

On May 2, 2013, the matter was continued to May 7, 2013, for contested hearing.

Mother cancelled the overnight visit scheduled for May 4, 2013, because she was going out of town to visit a sick relative.

On May 7, 2013, mother did not appear in court. Her attorney requested a continuance, stating that mother had not returned from her trip out of town. The juvenile court noted that, when the date was set, mother had said she would be available. The court denied the request for continuance finding no good cause.

Counsel for the Agency reported that the latest information from Dr. Mielke was that James's mercury levels were not concerning and chelation therapy was not recommended for him.

After argument, the juvenile court found, by a preponderance of the evidence, that return of James to mother would create a substantial risk of detriment to his safety,

protection, or physical or emotional well-being.  The court based its ruling on numerous factors: mother's failure to pay attention to James's medical needs, including the times she failed to pick him up from school when he was sick; the regression James exhibited after visits with mother; the tendency for mother to use the foster mother as a babysitter for her convenience; mother cancelling and changing visits with James at her own convenience; the amount of time mother spent researching issues on the Internet and writing voluminous e-mails, time which would be better spent caring for her children; mother's failure to inform the primary care physician that James was seeing Dr. Mielke and giving James supplements; mother's  Facebook picture with her request for 100,000 "likes"; and mother's plan to leave James for six weeks while she went to another state to have her twins.  The court ordered continued services until the 18-month hearing.

## DISCUSSION

Pursuant to section 366.21, subdivision (f), the juvenile court shall return a dependent child to the home of a parent no later than 12 months after the date the child entered foster care "unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."

> "In reviewing the sufficiency of the evidence on appeal, we look to the entire record to determine whether there is substantial evidence to support the findings of the juvenile court.  We do not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies.  Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order, and affirm the order even if there is other evidence that would support a contrary finding.  [Citation.]  When the trial court makes findings by the elevated standard of clear and convincing evidence, the substantial evidence test remains the standard of review on appeal.  [Citation.]  The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order.  [Citations.]"  (*In re Cole C.* (2009) 174 Cal.App.4th 900, 915-916.)

11.

We find substantial evidence supports the juvenile court's decision to not return James to mother's home at the 12-month hearing. Mother, despite months and months of assistance in parenting and counseling, continued to make the same mistakes over and over again. Once again, due to pregnancy, mother was unable to take the necessary medications to help with her mental issues. She again insisted that another pregnancy did not in any way add to her inability to care for James. Mother continued to be defiant toward James' school, the social worker, and physicians treating James, and insisted at all times that, through her research online, she knew better.

Most importantly, mother has not learned how to appropriately parent James. Mother focused on the autism and "fixing it," but did not seem to understand James' need for sleep, normal medical care, consistency and support. Mother argued for lengthier visits with James, but often cancelled or shortened the visits for her own convenience.

We find that there was substantial evidence to support the juvenile court's determination that James could not be returned to mother's home at the time of the 12-month review, and we reject mother's argument to the contrary.

## DISPOSITION

The orders of the juvenile court are affirmed.

_____

Franson, J.

WE CONCUR:

_____

Gomes, Acting P.J.

_____

Peña, J.

12.