Filed 6/30/14  In re J.V. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re J.V. et al., Persons Coming Under the Juvenile Court Law. | C075211 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.Y.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. JD233405, JD233406, JD233407) |

M.Y., the mother of 17-year-old twins Andy G. and A.G. and 14-year-old twins Joseph V. and J.V., appeals from an order of the Sacramento County Juvenile Court adjudging the latter three children (the children) dependents of the court, removing them from mother's custody, and ordering reunification services.  Andy previously had been adjudged a ward of the court and is not a subject of the dependency proceeding.

1

On appeal, mother contends (1) there was insufficient evidence the three children were at substantial risk of harm, (2) there was insufficient evidence that removal from mother's custody was necessary to protect them, and (3) there were reasonable alternatives for protecting the children short of removal from mother. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Originating Circumstances*

After arguing with Andy on the morning of June 3, 2013, mother retrieved a gun and fired one shot at Andy, who was not struck. Mother was arrested, and Andy and the children were taken into protective custody.

1. *Mother's Statement to Police Officer*

After being advised of her constitutional rights, mother told a responding police officer that Andy, who was "always creeping out" of the house, had not been home the previous evening. After noting his absence Mother had locked all the doors and windows. The next morning Mother found Andy inside the house but he refused to explain how he had obtained entry.

Mother told Andy to put out a trash can he had failed to put out the previous evening. Andy went to the back door and said something to mother. In response, she told him to "just go and get out of the house I don't even want you in here." Andy responded by calling mother "all kinds of bitches and motherfuckers."

As mother backed her car out of the driveway, she reflected on "how rude and nasty [Andy] was talking to his mother." She reentered the driveway and told him, "You stay right there, I'm going to show you who a bitch is[.]" Mother told the officer, "I went up stairs and I got my pistol and I put two bullets in there and he set his ass there and by the grace of God, I lost my mother a year ago, and I don't I guess it was God or somebody because my arm went down and shot towards the ground. *I wanted to wound him in his leg. I wanted to hit him in his leg*, I wasn't tr[ying] to kill him, but if I would have hit him in the leg I would have been satisfied, son of [a] bitch[.] This happened

2

outside.  After it happened he was hollering that he was calling the police.  I told him he better hurry up and call them.  I went into the house, I went to the bathroom and laid the gun on the dryer in the bathroom because it still had one bullet in it." (*Sic*, italics added.)

### 2.  *J.V.'s Statement to Police Officer*

J.V., who was 13 at the time, told a responding police officer that Andy, who was out of the house past his 10:00 p.m. curfew, had left a window open so that he could reenter the house undetected.  After discovering his absence, mother and J.V. closed all the windows so that Andy would have to enter through the front door.  J.V. saw Andy coming up the stairs at 3:00 a.m. and she did not know how he had entered.  After J.V. told mother that Andy had reentered the house, mother argued with Andy and told him to go outside.  Once outside, Andy yelled and called mother names.

J.V. told the officer:  "I heard my mom coming upstairs and she asked me where her gun was.  She then told me not to touch it and that she would get it.  I heard her go into her room.  [¶]  I heard her going back down the stairs.  I heard a gun-shot.  I was in my bedroom with the windows open.  My bedroom is towards the front of the house.  [¶] I heard my brother say 'if you are trying to kill me go ahead and kill me.'  I also heard my brother say he was calling the police on my mom.  [¶]  My mom came back inside and waited.  She was trying to charge her phone.  [¶]  My brother was outside still yelling at her.  [¶]  I went downstairs and asked my mom if she tried to shoot my brother.  She said no that she was mad he was calling her names."

### 3.  *Andy's Statement to Police Officer*

Andy made the following statement to an investigating police officer:

"I called 911 because my mom shot a gun at me.  She shot a gun at me and I think she was trying to kill me.

"This all started last night when I went out after curfew.  I live in this house with my mom, my older [adult] sister, my twin sister, my younger brother and my younger

sister (who are also twins).  My mom has a 10:00 pm curfew for me.  Sometimes I come in late after the curfew and my mom gets mad.

"Last night I went out with some friends and I didn't come home until about midnight.  I snuck in the house so I wouldn't wake anyone up and I went to sleep in my room which is downstairs next to the garage.

"Early this morning maybe around 6:00 am, my mom came in my room and woke me up.  She was yelling at me and telling me to get out of her house.  She said that she was tired of me staying out after curfew and that I needed to get out.  She yelled and said that she was kicking me out and that she didn't care where I went.

"I went out the front of the house and I was getting mad that my mom was kicking me out.  I yelled back at her and I did call her a bitch.  I said she was crazy and that she shouldn't get so mad about me being out late.  I walked out of the front of the house and I sat on the green electrical box in front of the neighbors.

"My mom was still yelling at me and she told me to 'wait there' because she 'had something for me' and was going to 'show me how crazy she can be.'  I thought that maybe she was going to whoop [*sic*] me with a belt or something because she went inside the house like she was getting something.

"She was inside for a minute and then she came back outside.  I didn't see her point the gun at me because I wasn't looking at her, but I heard a gunshot and I jumped up and looked at my mom and saw her holding her [] handgun in her hand.  I ran down the street to get away from her and she went back inside the house.

"I can't believe that she tried to kill me.  I know that she gets mad at me sometimes if I stay out late or get caught smoking weed, but I never thought she would actually try to kill me.

"I feel bad for calling the police on my mom and I don't want her to go to jail, but I was scared that she would shoot me if I went back to the house.  I don't want my mom to do hard time and I don't want to press charges against her."

4

### 4. *Police Officers' Observations*

After mother consented to a search of her home, officers located a Derringer .38 Special handgun in the guest bathroom. The gun was cocked and loaded with one live bullet and one shell casing. Officers also found the gun's holster and a "small black zip up bag" containing 13 additional rounds. A records check for the gun did not reveal the owner.

Mother advised the officers to remove from the house a second weapon, a black .357 pellet gun she had taken from Andy after she found him playing with it.

### 5. *Criminal Proceeding Against Mother*

Mother was convicted of discharge of a firearm in a grossly negligent manner that could result in injury or death. (Pen. Code, § 246.3.) She was placed on informal court probation for three years and was prohibited from possessing a gun for 10 years. The criminal court directed mother to complete a parenting program. She enrolled in the program in June 2013 and completed the required sessions with no absences.

### 6. *Children's Status at Time of Petition*

A.G. had completed the 11th grade with a 3.0 grade point average and was attending summer school in order to bring up her grades in some areas. Her interests were math, computer science, and basketball, in which she plays point guard and power forward.

On the day of the incident A.G. was placed with her paternal aunt and she desired to stay there. A.G. had entertained some self-harming thoughts, which mother had disregarded.

Joseph V. initially was placed in the home of A.G.'s paternal aunt. The aunt described Joseph as a "good kid" who helped out when asked. Although Joseph said he enjoys school and usually does well, his grades during the most recent year showed a steady decline. By the end of the year he had a 1.25 grade point average. Joseph had

several referrals for disrupting class. He was not interested in counseling and did not believe he had any problems to discuss.

J.V. reported she was a good student and does well in school, but her transcript showed she was failing all but one of her classes. She had been suspended 27 times, had 18 days of off campus suspensions, had 35 late days, and was tardy 36 times. In March 2013, J.V. instigated a fight between two other female students. As a result, she spent one day in on-campus suspension. In April 2013, J.V. was involved in a fight in which she repeatedly kicked another participant. As a result, she was suspended for three days. In addition, J.V. was defiant with school staff and needed to be redirected multiple times.

B. *Original Petitions*

On June 5, 2013, the Sacramento County Department of Health and Human Services (Department) filed petitions alleging the three children were at substantial risk of physical harm (Welf. & Inst. Code, § 300, subds. (a) & (j))[1] in that mother purposely discharged a firearm in the direction of their brother, Andy, in an attempt to harm him. The petitions also alleged the children had no provision for support (§ 300, subd. (g)), due to the incarcerations of mother and the father of the younger twins and the unknown whereabouts of the father of the older twins.[2]

C. *Detention*

On June 7, 2013, the juvenile court ordered A.G. and Joseph detained with A.G.'s paternal aunt and ordered J.V. detained with a maternal aunt.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

[2]     The father of the older twins was eventually located. Neither father is a party to this appeal. It is not necessary to recite the factual and procedural background related to the fathers.

D.  *Jurisdiction and Disposition*

The Department interviewed mother in June 2013.  Mother agreed she had purposely discharged the gun in the direction of Andy but claimed she had fired toward the ground.  She denied she had wanted to hurt him.

Mother believed, during his absence from the house, Andy drove her car without her permission.  However, Andy denied he had done so.  Mother also believed, upon his return, Andy entered the house using Joseph's keys that had been missing for about a year.

A.G. told the social worker she preferred to reside with the paternal aunt and did not want to return to mother's care.  She explained mother "was constantly screaming, yelling, and cussing at home" and thus A.G. "did not like being at home."

At a prejurisdictional status hearing in July 2013, the juvenile court determined Andy was in juvenile hall.  Andy's probation officer had indicated, because Andy was on probation, he must be housed in juvenile hall unless mother consented to his placement with a relative.

A September 9, 2013, addendum to the jurisdictional and dispositional report indicated that Joseph and J.V. had been placed at the Children's Receiving Home of Sacramento after their respective relative caregivers could no longer provide care.  Joseph had gotten into conflicts with other children and J.V. repeatedly refused to return to her placement.  At a prejurisdictional status hearing the next day, the Department filed first amended petitions alleging mother's conviction in the criminal case and deleting the nonsupport (§ 300, subd. (g)) allegations based upon mother's release from custody.  Counsel for Joseph and J.V. requested they be returned to mother's care.  In response to a question from Joseph, the court indicated "there needs to be evidence that there is a change in circumstances and to have us believe that if your mother becomes frustrated in the future when she is disciplining any child that she is not going to resort to violence."

The court told Joseph that mother's counsel wished to present evidence at the upcoming hearing.

In a September 23, 2013, pretrial statement, the Department indicated it would recommend placing Joseph and J.V. with mother under a program of dependent supervision. The Department recommended that A.G. remain in placement with her paternal aunt and that mother receive reunification services.

On September 26, 2013, a Department social worker spoke with the coordinator of the parenting program that mother had completed at the direction of the criminal court. The coordinator explained mother had been assessed on five factors before she started the program and reassessed on those factors after she completed the program. The reassessment showed no improvement on three factors, corporal punishment, appropriate family roles, and expectations of children. The reassessment showed regression from "moderate risk" to "high risk" on the factor of empathy.

Based on this information and further interviews with mother, the Department filed a report addendum stating it "remains unclear how the mother intends to discipline the children when needed, without the use of a firearm or physical punishment." The addendum recommended that Joseph and J.V. remain at the Children's Receiving Home, A.G. to remain in the care of her paternal aunt, and that mother continue to receive services, including attending a parenting program for difficult teen behavior.

At the contested jurisdictional hearing on September 30, 2013, mother was the only family member in attendance. The Department requested jurisdiction under section 300, subdivisions (a) and (j). Mother objected to jurisdiction based on her statements in the reports. The juvenile court sustained the petitions by a preponderance of evidence and set a dispositional hearing for October 30, 2013.

The social worker noted Joseph and J.V. were struggling in their placement at the Children's Receiving Home. J.V. exhibited significant behavioral concerns including theft, fighting, and being absent without permission. The juvenile court asked whether

8

any family members could care for J.V.  The social worker reported all available family members had declined.

At the contested dispositional hearing on October 30, 2013, mother appeared along with Joseph and J.V.  The Department recommended continued placement of the children in foster care and reunification services for the parents.  All three children's counsel joined in the Department's recommendation but counsel for Joseph and J.V. noted her clients personally wished to be released to mother.  Mother's counsel stated there was no clear and convincing evidence Joseph and J.V. cannot be returned to mother.  Counsel for mother stated mother did not object to A.G. remaining with the paternal aunt.

The juvenile court made findings and orders regarding A.G. and approved her continued placement with the paternal aunt.  During the same hearing, the court tried the contested issue of disposition as to Joseph and J.V.

Mother testified on direct examination that her court-ordered parenting class had addressed "[k]ids of all ages" and had talked about "comforting, nourishing, attachment, bonding.  Things I was already aware of."  When asked what she had learned in the parenting class about discipline, mother said, "It's kind of hard to say about disciplining.  It's the way that I discipline, the way we talked about discipline, not how I discipline."

This exchange ensued:

"Q  [BY MOTHER'S COUNSEL]  And did you -- were you talking about -- did they talk to you about how to handle when children talk back, those kinds of issues?

"A  [MOTHER]  Yes, somewhat.

"Q  And what did you learn from that portion of the class?

"A  About talking back?

"Q  Yeah.

"A  I don't know.  I don't know really.  I can't speak to that one."

When mother was asked how she might have handled the situation with Andy differently, she responded: "[I]n the allegations it stated that I shot at my son, you know. My gun only shot two bullets. I left one in the chamber, so I wasn't shooting at my son. My son never seen me come at him with a gun in my hand. I never came out of the house ranting and raving and calling him like I'm causing some bodily harm to him or anything. I see him out there. He was disrespecting me. I didn't believe that a child of mine would say such a thing the way he did. And so my hand was down with the gun. I just fired to the dirt. So he heard the gun go off and that's where he called the police at. But he never seen it in my hand. He didn't even know what type of handgun it was. It was a small . . . handgun. It only shot two bullets. You know, the statement said that I was shooting at my son. I never shot at my son. I'd never shoot to hurt my kids. I love my children unconditionally, so I wouldn't shoot to harm one of them."

When asked whether she would benefit from counseling, mother stated: "Yes, it's possible, but I don't think I've done anything wrong. I mean, me going to get my gun, I know that was wrong. You don't have to worry about that no more. I don't really think I need no counseling. I learned from that mistake because all of this stuff going on. So we don't have to worry about that no more. But I don't really think I need no counseling, you know, as far as that issue, 'cause I didn't do nothing wrong. My son wasn't going to get hurt. I wasn't aiming to hurt my child. I never shot at my son other than that. I raised seven children already. And I have three, you know, with a 4.0 going off to a four-year college, getting in college. So I think I've done a good job. . . ."

Mother testified that she believed J.V. has been having problems at her foster placement because she was frustrated and wanted to be home with mother.

When asked on cross-examination how she would respond if one of the children called her a bad name, mother answered: "Well, I'm probably going to get them to the side and talk to them, calm them down a little bit and talk about it. Tell them it's not

10

right. They can't disrespect me and stuff like that. I am their mother. They have to show some respect. I have zero tolerance for disobedience and bad behaved kids, you know."

The juvenile court found mother had made minimal progress toward alleviating or mitigating the causes that necessitated the out-of-home placement. The court found, by clear and convincing evidence, the three children would be in substantial danger if returned home and there were no reasonable means of protecting them without removal from the home.

DISCUSSION

I

*Sufficient Evidence of Substantial Risk of Harm*

Mother contends the juvenile court's jurisdictional finding is not supported by sufficient evidence the children were at substantial risk of harm. She argues, by the time of the jurisdictional hearing, she was willing to take appropriate steps to protect her children and actually participated in some services. Thus, in her view, it was not necessary for the juvenile court to assert jurisdiction over the children. We disagree.

A. *Standard of Review*

"We review the [juvenile] court's jurisdictional and dispositional findings for substantial evidence. [Citations.] Evidence is ' "[s]ubstantial" ' if it is ' " 'reasonable, credible, and of solid value.' " ' [Citation.] We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record in favor of the juvenile court's order and affirm the order even if other evidence supports a contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order. [Citation.]" (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161-1162.)

11

B. *Statutory Requirements for Jurisdiction*

" 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.] Subdivision (j) of section 300 is the one that most closely describes the situation regarding the [children]. Accordingly, we will focus on that subdivision." (*In re I.J.* (2013) 56 Cal.4th 766, 773-774.)[3]

"Subdivision (j) applies if (1) the child's sibling has been abused or neglected as defined in specified other subdivisions and (2) there is a substantial risk that the child will be abused or neglected as defined in those subdivisions. [Citation.] . . . '[S]ubdivision (j) was intended to expand the grounds for the exercise of jurisdiction as to children whose sibling has been abused or neglected as defined in section 300, subdivision (a), (b), (d), (e), or (i). Subdivision (j) does not state that its application is limited to the risk that the child will be abused or neglected as defined in the same subdivision that describes the abuse or neglect of the sibling. Rather, subdivision (j) directs the trial court to consider whether there is a substantial risk that the child will be harmed under subdivision (a), (b), (d), (e) or (i) of section 300, notwithstanding which of those subdivisions describes the child's sibling.' [Citation.]

"Unlike the other subdivisions, subdivision (j) includes a list of factors for the court to consider: 'The court shall consider the circumstances surrounding the abuse or

---

**3**     Thus, it is not necessary to consider mother's apparent contention the evidence was insufficient to sustain allegations under section 300, subdivision (a), cited in mother's opening brief as subdivision (b).

neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child.' [Citation.] 'The "nature of the abuse or neglect of the sibling" is only one of many factors that the court is to consider in assessing whether the child is at risk of abuse or neglect in the family home. Subdivision (j) thus allows the court to take into consideration factors that might not be determinative if the court were adjudicating a petition filed directly under one of those subdivisions. [¶] The broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of any of the subdivisions enumerated in subdivision (j). The provision thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.' [Citation.]" (*In re I.J., supra,* 56 Cal.4th at p. 774, italics omitted.)

C. *Evidence Supporting Jurisdiction*

Prior to the shooting, mother asked her 13-year-old daughter J.V. where mother's gun was and then told J.V. not to touch it. This evidence suggests mother allowed J.V. to know where the gun was located and how she could access it.

Mother admitted to the officer, at the time of the shooting, she harbored the intent to shoot Andy. Specifically, she said, "I wanted to wound him in his leg. I wanted to hit him in his leg . . . ." At the dispositional hearing mother denied this intent, claimed she "wasn't aiming to hurt [her] child," and said she would "never shoot to hurt [her] kids." We assume, in favor of the judgment, the juvenile court resolved this conflict in favor of mother's statement shortly after the incident. (*In re T.W., supra,* 214 Cal.App.4th at pp. 1161-1162.)

13

After the shooting, mother left the gun cocked with one bullet in it while she attempted to charge her cellular telephone.

Mother's intentional shooting at or near Andy was an extremely dangerous and callous act out of proportion to any oral provocation that might have preceded it and entirely unjustified by Andy's failures to obey curfew and take out the trash. Although hazardous in itself, the shooting was bookended by mother's dangerous acts of allowing J.V. access to the gun before the shooting and leaving the cocked and loaded gun in an area accessible to the children after the shooting. Conferring gun access to teenagers proven to be relatively volatile supported the exercise of juvenile court jurisdiction and removal of the children from mother. The broad language of section 300, subdivision (j) allowed the juvenile court to consider mother's intentional shooting of the gun as well as her repeated failures to store the gun away from the knowledge and reach of the children. (*In re I.J., supra,* 56 Cal.4th at p. 774.)

Mother disagrees, claiming juvenile court jurisdiction was not necessary for the protection of the children because the shooting was an "isolated" incident. But mother's failure to protect her children from a dangerous firearm was ongoing, rather than isolated, insofar as she relied on her 13-year-old daughter to remember where the weapon was located. Mother's claim she posed no risk of future harm to the children has no merit.

Mother claims the evidence is insufficient because she had no criminal or child welfare history. But as the appellant, mother "must *affirmatively demonstrate* that the evidence is insufficient," and she "does not show the evidence is insufficient by . . . arguing about what evidence is *not* in the record." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573, original italics.) In any event, mother does not argue juvenile court jurisdiction is warranted only for a second or subsequent episode of hazardous behavior.

Mother relies on two circumstances in asserting that she is not a danger to her children: she will be on probation for 10 years; and she will not be allowed to have a

firearm during her probation. But the firearm used in the present incident appears to have been unregistered. The juvenile court could scarcely believe and had no duty to conclude mother's probation would suffice to dissuade her from possessing another unregistered firearm.

Mother also relies on her statements to a social worker that should her children misbehave in the future, she would discipline them by taking items away from them; seek help from family members; and seek professional help if needed and if ordered to do so. But mother also stated, "I don't need counseling," even though she had admitted to an officer that she had intended to shoot her child. The juvenile court could hardly find any of mother's remarks reassuring.

Mother claims, before the juvenile court asserted jurisdiction, she participated in a "voluntary" program of parenting education. But the evidence showed mother's participation was not voluntary; rather, it had been ordered by the criminal court. The evidence also showed, on four of the five factors assessed by that program, mother regressed or failed to improve. Mother has not met her burden of showing there is no evidence of a sufficiently substantial nature to support the court's jurisdictional findings and order. (*In re T.W., supra*, 214 Cal.App.4th at pp. 1161-1162.)

II

*Sufficient Evidence of the Need for Removal*

Mother contends the juvenile court's dispositional order is not supported by sufficient evidence that the children could be protected only by removing them from her custody. She claims the "allegations of the petition that the children were in danger" were based upon mother's "difficult relationship with Andy," and that her "anomalous behavior" with Andy "should not be seen as sufficiently extreme to justify the removal of Joseph and J.V. We disagree.

15

A. *Statutory Requirements for Disposition*

To support an order removing a child from parental custody, the court must find clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the parent's . . . physical custody. . . ." (§ 361, subd. (c)(1).) The court must also "make a determination as to whether reasonable efforts were made to prevent or eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (d).)

Although "the [juvenile] court makes findings by the elevated standard of clear and convincing evidence, the substantial evidence test remains the standard of review on appeal. [Citation.] The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order. [Citations.]" (*In re Cole C.* (2009) 174 Cal.App.4th 900, 916.)

Moreover, when the arguments by petitioner " 'only tend to establish a factual context which, *had it been credited by the trial court,* might have led to a different decision,' " such arguments are facially meritless in light of the standard of review in this court. (*In re Charmice G.* (1998) 66 Cal.App.4th 659, 664, quoting *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214, italics added; see *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.)

B. *Juvenile Court Ruling*

In this case, the juvenile court ruled that the Department had met its burden of proof regarding the issue of relative removal. The court noted that mother "was pretty clear in her testimony that she doesn't believe she's done anything wrong." The court found mother had not made adequate progress in her parenting classes on the issues of discipline and punishment. The court stated it did not have any evidence "that the mother

16

is likely to engage differently with these children than she did with Andy." The court acknowledged that mother's gun had been removed and that a probation condition precluded her from getting a new one but noted, "it's not difficult to get a new gun." The court found there "is more work needed to address the issues that led to the children coming before the Court." In comments addressed to Joseph, the court stated that mother had not made enough progress on discipline issues. Because mother had fired a gun, there was too great a risk that she could do "something similar" such as intentionally hitting or striking someone or picking up a knife. Because of the "number of incident reports" regarding Joseph and J.V., mother "may need to use discipline based on [their] behavior" and she had not made sufficient progress to discipline in a safe manner.

C. *Mother's Contentions*

Mother claims the evidence was insufficient because she "willingly participated in services on a voluntary basis, and is continuing to do so." Mother testified about the number and length of parenting classes and the material that was discussed. Had the juvenile court been satisfied with mother's progress it could have issued a more favorable order. But the court credited the Department's evidence that mother's participation had been inadequate. Mother's claim is meritless in light of our standard of review. (*In re Charmice G.*, *supra*, 66 Cal.App.4th at p. 664.)

Mother relies on her lack of criminal and child welfare history unrelated to this case. But, as noted, mother cannot show the evidence is insufficient by arguing about what evidence is *not* in the record. (*People v. Sanghera, supra,* 139 Cal.App.4th at p. 1573.)

Mother also relies on her testimony denying she had aimed the gun at Andy or had shot at Andy; claiming she had fired one bullet into the ground; expressing willingness to seek outside help if problems arise with the younger children; and claiming she has successfully raised other children. But the juvenile court impliedly declined to credit this

testimony and credited contrary evidence. Mother's appellate argument does not establish contrary evidence supporting removal was insufficient.

Mother claims the juvenile court's formal removal of A.G. was unnecessary because all parties agreed A.G. should be allowed to remain with her aunt. But A.G. was capable of changing her mind about returning to mother and thus could face the same danger as her younger siblings. Mother has not shown the juvenile court's order foreclosing that possibility was an abuse of discretion.

Mother lastly contends Joseph and J.V. are in an unsatisfactory foster placement that fails to meet their educational needs and encourages bad behaviors such as fighting, property damage, and several unauthorized returns to mother's residence. But nothing in the statutory scheme requires or allows the juvenile court to address an unsatisfactory foster placement by returning a child to a dangerous parental home in lieu of seeking a more suitable foster placement. The children's difficulties at the Children's Receiving Home do not suggest the evidence supporting removal was somehow insufficient. The juvenile court's dispositional order is supported by substantial evidence. (*In re Cole C., supra,* 174 Cal.App.4th at p. 916.)

### III

### *Reasonable Alternatives to Removal*

In a separate argument, mother contends "there were reasonable alternatives to protect the children short of removal from mother's custody," but the only "alternative" identified in her briefing is return of Joseph and J.V. to mother under unspecified "conditions placed upon her by the juvenile court to reasonably ensure the wellbeing [*sic*] of Joseph and [J.V.]" Mother also complains there "were reasonable means to prevent removal which were not explored by the [D]epartment or considered by the [juvenile] court." But mother does not even identify, let alone explore, any of the supposedly reasonable alternatives in her briefing. Mother's arguments fail for lack of explication. (Cf. *In re Sade C.* (1996) 13 Cal.4th 952, 994.)

18

DISPOSITION

The orders of the juvenile court are affirmed.

      NICHOLSON    , J.

We concur:

      RAYE    , P. J.

      ROBIE    , J.